1              IN THE UNITED STATES DISTRICT COURT
              WESTERN DISTRICT OF ARKANSAS
2                  HOT SPRINGS DIVISION

3    TERRY D. TOLER, DONNA R.
     TOLER,
4
          Plaintiffs,
5       v.                              No. 6:12CV06032 RTD

6                                       November 18, 2014
                                        Hot Springs, Arkansas
7                                       8:40 a.m.
     EXPERIAN INFORMATION
8    SOLUTIONS, INC.,

9         Defendant.

10            **TRANSCRIPT OF JURY TRIAL - VOLUME 1**
            BEFORE THE HONORABLE ROBERT T. DAWSON,
11       UNITED STATES DISTRICT JUDGE, and a jury

12   APPEARANCES:

13   On Behalf of the Plaintiffs:

14       MR. NICHOLAS HEATH WOOTEN, Attorney at Law
          Nick Wooten, LLC
15        1702 Catherine Court
          P.O. Box 3389
16        Auburn, Alabama  36831

17       MS. ANNABELLE L. PATTERSON, Attorney at Law
          Annabelle Lee Patterson, PLC
18        646 Quapaw Avenue
          Hot Springs, Arkansas  71901
19
         MS. KATHY A. CRUZ, Attorney at Law
20        Cruz & Associates, PLC
          1325 Central Avenue
21        Hot Springs, Arkansas  71901

22       MR. JOEL G. HARGIS, Attorney at Law
          Crawley, DeLoache & Hargis, PLLC
23        533 W. Washington
          Jonesboro, Arkansas  72401

24

25                                      [CONTINUED:]


              Judith A. Ammons, RPR, CRR, CCR
                United States Court Reporter

```
 1      APPEARANCES CONTINUED:

 2      On Behalf of the Defendant:

 3          MR. JOSHUA LEE FUCHS, Attorney at Law
            MR. WILLIAM ROQUEMORE TAYLOR, Attorney at Law
 4          MS. NICOLE MARIE PERRY, Attorney at Law
              Jones Day
 5            717 Texas, Suite 3300
              Houston, Texas  77002
 6
            MR. DANIEL J. MCLOON, Attorney at Law
 7            Jones Day
              555 South Flower Street, 50th Floor
 8            Los Angeles, California  90071-2300

 9          MS. TANYA SPAVINS, Attorney at Law
              Bridges, Young, Matthews & Drake, PLC
10            508 Ouachita Avenue, Suite A
              Hot Springs, Arkansas  71901

11

12

13

14

15

16

17

18

19

20          Proceedings reported by machine stenography and displayed
        in realtime; transcript prepared utilizing computer-aided
21      transcription.

22

23

24

25
```

                    Judith A. Ammons, RPR, CRR, CCR
                     United States Court Reporter

1                  I N D E X - VOLUME 1 (November 18, 2014)

2

3     PRETRIAL (CONTINUING)                                          5

4     PLAINTIFFS' OPENING STATEMENT                                 13

5     DEFENDANT'S OPENING STATEMENT                                 19

6     COURT'S EXHIBIT 1 (Stipulations)                              42

7

8

9     WITNESSES:                    Direct  Cross  Redirect  Recross
      (For the Plaintiffs)

10

11    TERRY TOLER                      46     135

12    EXHIBITS:                                              RECEIVED

13    Plaintiffs' Exhibit 84   ................................P.57

14    Plaintiffs' Exhibit 86   ................................P.59

15    Plaintiffs' Exhibit 110  ................................P.63

16    Plaintiffs' Exhibit 112  ................................P.65

17    Plaintiffs' Exhibit 113  ................................P.67

18    Plaintiffs' Exhibit 118  ................................P.67

19    Plaintiffs' Exhibits 133 and 134  ......................P.69

20    Plaintiffs' Exhibit 135  ................................P.71

21    Plaintiffs' Exhibits 139 and 140  ......................P.73

22    Plaintiffs' Exhibit 141  ................................P.75

23    Plaintiffs' Exhibit 142  ................................P.76

24    Plaintiffs' Exhibit 161  ................................P.78

25    Plaintiffs' Exhibit 160  ................................P.80

                      Judith A. Ammons, RPR, CRR, CCR
                         United States Court Reporter

1                        I N D E X - Continuing

2   **EXHIBITS:**                                          **RECEIVED**

3   Plaintiffs' Exhibit 179 ..............................P.84

4   Plaintiffs' Exhibit 187 tendered and refused ...P.88

5   Plaintiffs' Exhibit 181 ..............................P.85

6   Plaintiffs' Exhibits 183, 188, 199, 201, 207,

7   218, 220, 226, 230, 236, 240, 242, 250, 265, 288,

8   296, 297, 307, 313, and 373 ..........................P.92

9   Plaintiffs' Exhibit 205 ..............................P.95

10  Plaintiffs' Exhibit 204 ..............................P.97

11  Plaintiffs' Exhibit 251 ..............................P.100

12  Plaintiffs' Exhibit 295 ..............................P.100

13  Plaintiffs' Exhibit 301 ..............................P.103

14  Plaintiffs' Exhibit 324 ..............................P.105

15  Plaintiffs' Exhibit 328 ..............................P.106

16  Plaintiffs' Exhibit 330, page 5 .....................P.107

17  Plaintiffs' Exhibit 340 ..............................P.109

18  Plaintiffs' Exhibit 347 ..............................P.110

19  Plaintiffs' Exhibit 354 ..............................P.112

20  Plaintiffs' Exhibit 360 ..............................P.115

21  Plaintiffs' Exhibit 377 ..............................P.125

22  Defendant's Exhibit 32 ..............................P.148

23  Defendant's Exhibit 44 ..............................P.151

24  Defendant's Exhibit 10 ..............................P.156

25

                    Judith A. Ammons, RPR, CRR, CCR
                       United States Court Reporter

              P R O C E E D I N G S

1

2          (Proceedings commencing in chambers as follows:)

3              THE COURT:  Listen, have we got everybody here?

4              MR. WOOTEN:  Yes, we have.  Our cocounsel, they are

5     sitting with the clients.  We're fine.

6              THE COURT:  They are not talking to the prospective

7     jurors?

8              MR. WOOTEN:  Visiting with the panel.

9              THE COURT:  Guys, we're at 8:40 here in chambers out

10    of the presence of the jury.  Have y'all seen the order on --

11             MR. WOOTEN:  The redesigned order with the statement

12    about there may be instructions later on --

13             THE COURT:  No.  This is on Mr. Hendricks' testimony.

14    Have y'all seen it?

15             MR. WOOTEN:  I have not, Your Honor.

16             MS. PATTERSON:  I did.

17             MR. FUCHS:  I have, too.

18             THE COURT:  I worked on this all night, too.  I had

19    originally said that he could probably at least testify about

20    what damages are authorized or could be authorized under the

21    act.  Then I started worrying about, I'm fearful if we get into

22    that, they may think there's something other than mental

23    anguish.  So I've got a -- if you want to look at that.  I

24    think if it could be followed up with a question, "Mental

25    anguish is authorized and there are other things that are

                    Judith A. Ammons, RPR, CRR, CCR
                      United States Court Reporter

1    authorized, but they aren't relevant in this case," I think we

2    would probably be all right.

3              MR. WOOTEN:  And that is one of the things we had

4    covered in instructions about the types of items that you could

5    claim.  And I guess they all sort of fall into the general

6    category broadly of mental anguish type damages: embarrassment,

7    humiliation, those types of things.

8              THE COURT:  As long as it's pretty clear it's only

9    directed to mental anguish.

10             MR. WOOTEN:  Right, as that distinction you made

11   yesterday, you're not going to let me write on the board they

12   lost $600,000.

13             THE COURT:  No.

14             MR. WOOTEN:  That stuff just goes to the weight of the

15   situation.

16             THE COURT:  Or big bucks.

17             MR. WOOTEN:  Right.  You know, as we noted, I really

18   don't like to recommend to a jury, especially with mental

19   anguish, say:  I think y'all should award X amount.  I really

20   do think that's the hardest part of the case and that really is

21   the toughest part of the work the jury has to do if they decide

22   the plaintiffs should recover.

23             THE COURT:  We have had a case or two down here of

24   late where I thought the plaintiffs would very well recover.

25   And the plaintiff's attorney asked for a lot more money and

1    they gave them nothing.  I'm glad I'm not in the business you

2    guys are in.

3              MR. WOOTEN:  There's lots of days I wish I was doing

4    something else.

5              THE COURT:  Any problems with the order as revised as

6    long as we have got an understanding where we're going?

7              MR. FUCHS:  I don't have any problem with it, Your

8    Honor.

9              MR. MCLOON:  I don't see any.

10             THE COURT:  Did y'all make any headway on the

11   stipulation?

12             MR. WOOTEN:  We did, Your Honor.  We circulated some

13   stuff late last night, we were both up late, and we have got a

14   number that I think I sent back -- and I don't know if you even

15   had a chance to see it -- the things you changed, I said I was

16   fine with the last version we had.

17             THE COURT:  I may need to see it at some point.

18             MR. WOOTEN:  Right.  We'll get a clean copy.  We

19   talked about, Josh was going to try to get a clean copy and

20   present to you.  It's a situation, I think it will help us a

21   lot with timelines and probably eliminate some exhibits and --

22   but there may be a couple of things we have to actually explain

23   on a couple of stipulations.  I think we both agree on that.

24   But it should help a lot.

25             THE COURT:  We're still shorthanded today.  We have

1    one CSO.  And I think you know if you've seen transcripts, I've

2    been trying stuff in Nebraska and Texas and the Eastern

3    District and whatever.  And we always have more CSOs than we

4    need.  For whatever reason, we only have one.  And then even

5    talked about being a second one, or you'll have to have a

6    catered lunch.  And the marshal discussed it and said you can't

7    do it.

8           MR. FUCHS:  Your Honor, on the stipulated facts, I

9    think it was 26 stipulated facts, something like that, that

10   kind of was a chronology of the communications that the

11   plaintiffs had with Experian, we went ahead and stipulated to a

12   couple of facts after the lawsuit.  We want to make, at some

13   point on the record, that that stipulation is subject to our

14   arguments that that shouldn't come in at all in any form.  But

15   other than that, I think we'll be able to give you 26, 27

16   stipulated facts.

17          THE COURT:  When do you think I should give them:

18   After the jury is selected and I guess after opening

19   statements, or before, or what?  When do you want me to read

20   the stipulations to the jury?

21          MR. FUCHS:  I think it would be after opening

22   statements.

23          MR. WOOTEN:  I think that would be fine.

24          THE COURT:  Are there any surprises in opening

25   statements?  Anyone going to use any exhibits or drawings?

1        MR. WOOTEN:  We discussed this yesterday, and what we

2    had agreed to, if there were documents that neither party

3    objected to, we didn't have a problem with the other party

4    using them.

5        THE COURT:  Apparently all of the exhibits have been

6    objected to, those not coming in, I understood it.

7        MR. FUCHS:  So we -- I think plaintiffs have submitted

8    their list without a stipulated column.  We stipulated -- we

9    submitted our list with a stipulated column.  We actually did

10   stipulate to, I don't know, 60 or 70 exhibits, and those are

11   stipulated, they were subject to the rulings on the motions in

12   limine.  And I don't know that we've actually talked about

13   whether those rulings changed anything, but I don't think they

14   did.

15       THE COURT:  There are still 60 or 80 not agreed to?

16       MR. FUCHS:  There's more like 150 to 200.

17       THE COURT:  Let's just do them all the hard way.

18   Let's do it one at a time and make your objections with the

19   jury standing there.

20       MR. WOOTEN:  I think one issue we can talk about may

21   help some.  One thing we talked about yesterday a little bit in

22   limine, a lot of things happened leading up to the timeline

23   where the credit reporting kind of got messed up that they want

24   to bring in, the Tolers could have had mental anguish from

25   these other sources like other lawsuits and claims.  You know,

1   we're perfectly willing, you know, to put the Tolers on the

2   stand and ask them, "Were you defendants in these other cases,

3   and, you know, in some instances was there a judgment against

4   you," some amount or whatever, and so, you know, bring that

5   testimony on out and let that come in.  And my thought is it

6   might obviate the need to bring in the documents in some

7   instances as far as the complaints and the judgments, just to

8   move the thing along.

9          THE COURT:  You can do that, but he can cross-examine.

10  If you need to use exhibits, he can.

11         MR. WOOTEN:  Sure.

12         THE COURT:  Is there anything else we need to worry

13  about?  I was concerned about the order more than anything.

14         MR. WOOTEN:  I think the order is fine.

15         MR. FUCHS:  Two very limited things.  In opening, the

16  plaintiffs stipulated -- I have a timeline, a broad timeline I

17  was going to use.  I'm not planning on using any exhibits, just

18  that timeline.

19     And then, secondly, you know, I anticipate that the

20  plaintiffs are going to argue during opening about

21  after-the-litigation conduct.  And we, of course, have an

22  objection to that.  I don't want to stand up in Mr. Wooten's

23  opening and object to it.

24         THE COURT:  Let me say this about opening and closing

25  arguments.  I had practiced law for 35 years, had been a judge

1   for 20 before I heard a closing argument or opening statement

2   ever interrupted by an objection.  But apparently now that's

3   taught in law school someplace you do it.  But I do not look

4   kindly or --

5           MR. MCLOON:  We certainly don't want to do it.  We

6   wanted to make sure the record reflected our not objecting

7   during opening statements --

8           THE COURT:  I understand.

9           MR. MCLOON:  -- is not a waiver of our objections.

10          THE COURT:  It's not real evidence and closing

11  arguments aren't either, for that matter.  But I think it's --

12  I had Sam Perroni in one and Perroni was doing that, and I told

13  him I thought it was improper.  And he teaches evidence and

14  trial practice apparently at the law school and he apparently

15  is teaching a whole generation that's the way to do it.  I

16  don't think it is.

17          MR. WOOTEN:  I have not been practicing as long as

18  Your Honor, but it is a recent phenomenon for me; in the last

19  five years, very prolific.

20          THE COURT:  I think it's most improper, in any event.

21  Guys, anything else?

22  We'll get started.

23  Do you know where we are with getting jurors?

24          THE LAW CLERK:  I don't.

25          MR. WOOTEN:  He ran us out of the courtroom and said

1    he was bringing them all in when we were setting out boxes.

2           THE COURT:  I guess it means they are cleared.  And

3    also we're having magistrate court at the same time.

4           MR. WOOTEN:  It was a big crowd outside today.

5           THE COURT:  We can go off the record.  Thank you very

6    much.

7        (Recess at 8:56 a.m.)

8                              * * * * *

9        [Jury voir dire reported, but not transcribed.]

10                             * * * * *

11       (Proceedings continuing in open court at 11:18 a.m.; jury

12   present.)

13          THE COURT:  Everybody who needed to call, did you

14   call?

15       We're going to proceed with the opening statements here in

16   a moment.  I think we've got --

17       Sallie, do we have different badges for them?

18          THE COURTROOM DEPUTY:  Yes, sir.  In the jury room,

19   there's a box, and just, like, you tear one off and put it over

20   that one if you want to.

21          THE COURT:  And I would tell you to remember your

22   number.  But if you forget your number between now and when you

23   come back, I promise you I've made a note here.

24       It is important that if you do leave the building, or if

25   you're in the building, to wear your juror designation.  It's

Plaintiffs' Opening Statement                    13

1    important for people to know that you're on the jury.  That way

2    they'll not inadvertently try to strike up a conversation with

3    you or something like that.  The lawyers are very friendly, I

4    know the attorneys, but having said that, they may be reluctant

5    to say anything to you because it looks like something could be

6    going on, and, of course, it's not.

7         We're going to hear opening statements now.  Opening

8    statements are not evidence.  It's simply the attorneys are

9    giving you a roadmap of what they believe the evidence will be

10   and what they think the exhibits will show as we proceed

11   through the trial.  Again, I told you about note-taking.

12        Also, you can bring water in this courtroom if you have

13   it.  This is -- I think this is the dryest courtroom, I guess,

14   in the south, for whatever reason.  So if you do need to bring

15   in a bottle of water, you certainly can.  You can't bring

16   anything else in other than water.  You'll have to leave your

17   coffee in the other room, too.  And, hopefully, we'll have

18   coffee for you in there by the time we do have a break.

19        We're going to hear the opening statements on behalf of

20   the plaintiffs.

21        Mr. Wooten.

22        (Off the record.)

23          MR. WOOTEN:  Thank you, Your Honor.

24        Thank y'all again for being here and serving.  As the

25   judge said, it's a very important part of our system and we

1    need jurors to resolve disputes in cases that make it to the

2    courtroom.  You know, lots of cases never see the courtroom.

3    They get over with for one reason or another.  So this is a

4    rarity, this is an unusual occurrence.

5          These cases are not unique.  This defendant is a company

6    that sees these types of cases from time to time, place to

7    place.  And they always involve two primary issues or almost

8    always involve two primary issues.  The first one is the

9    accuracy of information contained on the Tolers' credit report.

10   And the law requires Experian to maintain procedures to have

11   maximum possible accuracy.  And the judge is going to give you

12   all instructions about what the law requires when the time is

13   right.

14         And the other thing that they are required to do is when

15   you have a dispute -- because you don't have control of this

16   data, it's their data, it's in their databases, and they have

17   people who provide them the data that they control.

18         When you have a dispute and you go to these folks and you

19   say, "Look, I've got a problem.  This is not right.  And I need

20   help.  I need you to fix it.  I need you to investigate it" --

21   and the law says that if they do an investigation or

22   reinvestigation, then what they are supposed to do, if they

23   can't verify the data, is they are supposed to either delete

24   it, update it, or correct it as circumstances are appropriate.

25         What you're going to hear in this case is that Experian

Plaintiffs' Opening Statement                              15

1   does not have any policies and procedures in place to track

2   what happens to their data over time.  And that's important in

3   this case for this reason:  Beginning in 2009, the Tolers were

4   talking to a mortgage servicer, PHH, about a loan modification.

5   The Tolers weren't behind.  They were making their payments.

6   They actually began inquiring about a refinance, and their

7   mortgage servicer talked to them and said, "Hey, we think y'all

8   just need this modification.  There's this program going on.

9   If you'll do that, it will be fine."  And they promised them it

10  would be a quick, easy, and painless process.  It was not.  It

11  was three years.  It was a constant struggle.

12         Finally, in December of 2010, there was a recorded loan

13  modification recorded over here in Garland County in the

14  clerk's office.  And so the Tolers had issues with their credit

15  reporting during that period of time.  And there were a number

16  of times that PHH went in, either because the Tolers complained

17  or because they realized they made a mistake, and they altered

18  the payment history substantially.

19         Experian -- there's no one at Experian that can tell you

20  when they did it or how they did it except by certain little

21  documents, I call them souped-up e-mails.  ACDVs is what they

22  refer to them as.  Pretty simple process:  Furnisher of

23  data responds to a request by Experian to verify what's there.

24  Usually what is going to happen is Experian is going to send

25  them the data that the furnisher has previously given them and

1    they're going to say, "Did you give us this data?"  And

2    Experian calls that a reinvestigation.  That's equivalent to me

3    asking my co-counsel is he wearing a gray suit.  He says, "Yes,

4    I'm wearing a gray suit."  It's somewhat of an absurd process

5    in a lot of ways, but that is their process.

6          So when the Tolers were saying, "Your data is wrong," the

7    person who provided them the wrong data, they simply asked

8    them, "Did you provide us this data?"  And they said, "Yeah, we

9    did.  It's good."

10         And what you're going to notice when we get into the

11   documents and because we -- sometimes lawyers, we squabble too

12   much.  And I try not to.  So we got into some fights about some

13   documents, so that process is going to move a little slower

14   than I wished.  But by closing arguments, you'll see in the

15   documents things that common sense says to you just should not

16   be missed, bad problems.

17         For instance, in 2011, February, the Tolers' credit

18   reporting went from current, perfect, paid as agreed, to six

19   months' delinquent.  In a 28-day cycle, the Tolers' credit

20   report said that they were 180 days behind.  No one caught

21   that, and you'll hear testimony that no one ever will because

22   that's not the thing that Experian concerns itself with, even

23   though the law requires them to maintain policies and

24   procedures to ensure that the data in credit reports is

25   accurate.

1          Because when you think about what a credit report is, or a

2     consumer disclosure, I call them credit reports, it is your

3     life.  If your credit is wrong, your life is wrong.  It messes

4     with your job.  It messes with your insurance.  It messes with

5     your creditworthiness.  It messes with what people you are

6     dealing with in business and personal life think about you.

7     And that's a very difficult process.  And the Tolers have been

8     dealing with that process with Experian since this lawsuit

9     started in 2012.  The problems go back before that.

10         And one of the most important things about what happened

11    is you're going to hear Experian, unless they deviate from what

12    they always say, they are going to say:  The first thing we do

13    when we get sued, we go file their souped-up e-mail, the ACDV,

14    with the person who gave us the data.  And then we say:  Tell

15    us what's right.  They've got a lawsuit in front of them that

16    says:  This is what's wrong.  And they go tell them -- say:

17    Tell us what's right.  And what they ask them to tell them is:

18    Is what you've been telling us what we ought to have?  They

19    give them the same thing they've been telling Experian.

20         And in that point in time in this case when the lawyers

21    for Experian, not Donna and Terry Toler, the lawyers for

22    Experian who are defending the lawsuit, say:  Tell us if this

23    is right, PHH responds and changes substantially serious

24    amounts of the data, the amounts past due, the periods of

25    delinquency, the time of the delinquency, giant changes that

1    any of us will look at and we would go:  Wow, that's

2    significant.  Their computers didn't catch it, their corporate

3    representatives didn't catch it, and their lawyers didn't catch

4    it.

5         You'll hear from an expert, his name is Evan Hendricks,

6    he's well-respected in the industry.  There's really nobody

7    else that testifies for consumers about how these things happen

8    and what causes them to occur and why something so obvious is

9    missed by this company who holds our entire lives in their

10   hands.

11        And what he'll tell you is they've known about this

12   forever.  It's been going on for years.  They know and they

13   don't care.  They understand a certain number of people are

14   going to get hurt.  They understand a certain number of people

15   will have problems.  And it's just --

16             THE COURT:  This is beginning to sound a little like

17   closing argument.  This is opening statement.

18             MR. WOOTEN:  Yes, sir.  I'm wrapping up.

19        So the other thing that's important that I want you to

20   remember, when you start looking at the issue of the

21   reinvestigation of this account, you're going to hear a lot of

22   things said during this trial about Donna and Terry Toler.  And

23   I'd like for you to compare how much time and effort is spent

24   to fix Donna and Terry Toler's problem versus what is spent to

25   come here and say really unpleasant things about the Tolers

1   that really have nothing to do with credit reporting to try to

2   make them look bad for y'all.  Because there's going to be some

3   lawsuits.  Terry's been in business, he's been sued before,

4   he's had a couple of judgments against him in the past.

5       But what you're going to find is, the things that they

6   want to use to pound on Donna and Terry, they weren't even on

7   their credit reports during these time periods, never were

8   considered by a credit grantor or denier.  They're just here to

9   make them look bad because the Tolers challenged Experian in

10  the way that they treated the Tolers.  That's what the case is

11  going to be about.  It's going to be -- hopefully, if we go

12  smoothly, we'll be done with our part of the case, hopefully,

13  by midafternoon on Thursday.

14      I appreciate y'all's time and attention.  I'm looking

15  forward to presenting this to you all.

16          THE COURT:  Thank you, Mr. Wooten.

17      Mr. Fuchs.

18          MR. FUCHS:  Yes, Your Honor.

19      Well, I'm having trouble.  There we go.  Thank you, sir.

20      Well, I think that when the case is over, you're going to

21  see a much different picture than the one that's just been

22  painted.

23      One of my dad's favorite sayings is, "Josh, I'm stuck

24  between a rock and a hard spot."  And that's another way of

25  saying you're stuck in the middle.  And that's exactly where

1    Experian finds itself here: in the middle of a mortgage

2    company, one of the largest in the United States, that

3    served -- that gave the Tolers their mortgage and then modified

4    their mortgage because they were on the verge of having a

5    foreclosure, and the Tolers.  Experian's in the middle, right

6    dead in the middle.

7         And what you're going to learn is, that PHH, all the way

8    up until today, is telling us to report it exactly how we're

9    reporting it.  And what you're going to learn is, the Tolers

10   are saying it's wrong and, see, there's some abnormal things

11   that are popping up.  What you're going to learn is that they

12   are not abnormal.

13        In modifications, things are strange.  You have a mortgage

14   and that mortgage says you owe this amount.  And then the

15   mortgage company -- you go to the mortgage company and say, "I

16   can't make my payments.  You're going to foreclose on my house.

17   You've got to help me."  And the mortgage company says, "Okay.

18   We'll try."  And it doesn't mean that your original terms were

19   changed.  It means they are going to work with you.  And then

20   over time, they may change the original terms.

21        What you're going to learn is that causes people to go

22   from zero to 180 days late in the modification world.  What

23   that means is you're going to learn that it causes people to be

24   current one day, and then they didn't make their payments, and

25   it goes all the way back to the original.

1        So all of these abnormal things that the plaintiffs'

2   lawyer just said -- Mr. Wooten just said we're going to learn,

3   I think when the full picture is painted, you're going to see a

4   different story.

5        Now, the Tolers, like many Americans, went through a

6   difficult time in the recession.  But they went through a much

7   more difficult time than a lot of Americans because they

8   decided in 2005 to start a neighborhood, a community called

9   Eagle Rock, just outside of Hot Springs.  And when they started

10  that neighborhood, they got some friends to invest with them,

11  they got some other church members to invest with them.  And

12  when that neighborhood started to fall down because of the

13  recession and because of the turn in the market, they got the

14  blame.

15       And when the plaintiffs -- Mr. Wooten said two lawsuits.

16  We're talking about 12 lawsuits from 2007 through 2011, nothing

17  to do with PHH, nothing to do with Experian.  That is what we

18  are going to talk a little bit about because the plaintiffs'

19  case is about mental anguish.  They say that we caused all of

20  their stress and worry.  And they want you to ignore what was

21  going on in their lives.

22       And so I'm going to take you through this timeline very

23  briefly three times and tell you what the evidence is going to

24  show each time.

25       The first time, I'm going to take you through with Eagle

Defendant's Opening Statement

1    Rock.  And I want you to kind of ignore the words on this right

2    now because Eagle Rock is not on here.  And when I use this in

3    closing, I hope those words mean something to you.

4        The second time I'm going to take you through this, I'm

5    going to take you through the Tolers' history with PHH.  PHH is

6    a mortgage company.  They are not Experian.  We don't have

7    PHH's records.  We don't get PHH's records.  That's not how the

8    process works.  We get one piece of data about the Tolers from

9    PHH and from 200 other -- 2 million more mortgage -- mortgages

10   that they house data for, but we don't get the underlying

11   records.

12       The third time I'm going to take you through this

13   timeline, I'm going to take you through the Tolers' very, very

14   limited contact with Experian.

15       So the first time through, we start with the Eagle Rock

16   community.  In 2005, before this board starts, they decide to

17   start a neighborhood.  They take out -- they sell their home on

18   Lake Hamilton.  They take their life savings, $600,000, and

19   they put it into a company, a company called MDC.  Don't worry

20   about the initials now.  You're going to pick them up over the

21   course of the case.  They start this company.  They go get a

22   million dollars' worth of loans to put in this company.

23       So they've taken their life savings, and they've got a

24   million dollars' worth of loans in this company.  And then the

25   real estate market tanks.  And because of that, they are sued

Defendant's Opening Statement                    23

1    over and over and over again.  And we're going to go through

2    some of those lawsuits.  We won't dig through the whole history

3    of the Tolers.  That's not what this is here for.  But the case

4    is about mental anguish, and you need to determine what's going

5    on in their lives.

6         In addition to the lawsuits, you're going to find out that

7    in 2010, before Experian is even in the picture, the banks on

8    the million dollars' worth of loans said, "You're not paying.

9    You haven't paid your taxes.  You're not paying.  We're going

10   to foreclose."  And they started those foreclosures in February

11   of 2011 and August.

12        Now, they are going to say because they are in 2011 has

13   something to do with Experian.  But when you look closely, they

14   weren't paying in 2009, they weren't paying in 2010, long

15   before Experian ever entered the picture in any form or

16   fashion.

17        Now, the trip through this timeline with PHH, it's a

18   really difficult trip.  PHH -- they enter into a mortgage with

19   PHH in 2007.  It's an interest-only for the first five years,

20   which means you don't pay anything on the principal.  It's

21   7 percent, a little over that.  The Tolers are going along

22   paying.  Experian is reporting that information, so is

23   TransUnion, so is Equifax.  And that's a good thing you're

24   going to find out.  They are reporting that they are paying.

25        In 2009, the Tolers went to PHH and said, "We can't make

Defendant's Opening Statement

1    our payments.  We can't even come close.  We have no money in

2    our savings.  We have put it all into this MDC.  We have no

3    money whatsoever.  We can't make our payments."  And you're

4    going to see the hardship affidavit they submitted saying they

5    have no cash whatsoever.

6        So PHH gave them a trial modification.  You're going to

7    find out that from the trial modification period all the way to

8    today, the Tolers have been fighting with PHH about whether the

9    modification was final, about whether they were making their

10   payments.  You're going to see insufficient funds letters.

11   You're going to see foreclosure notices, two of them, in

12   February and March of 2011.  You're going to see door notices

13   that were put on their doors.

14       And you're going to find out that Mrs. Toler, when she

15   says she has mental anguish, that that was killing her, that

16   when she would walk outside -- her neighborhood was blaming her

17   for the lawsuits and blaming Mr. Toler for the lawsuits.  When

18   she would walk outside, it would kill her to go to the mailbox

19   because she didn't know what PHH was going to send next.

20       You're going to learn that Mr. Toler was so angry, that he

21   was calling PHH 30, 40 times, started recording the calls,

22   recording the calls.  And you're also going to learn that

23   during that time, he never called Experian, not once.  You're

24   going to learn that he contacted Experian twice.  And he said,

25   "This payment amount is wrong" the first time.  And the second

1    time, he said, "We were never late."

2         And you are going to learn -- and so now I'm really going

3    through the third time in the timeline.  You are going to learn

4    that Experian has policies and procedures.  We house data for

5    over 200 million Americans.  We have over 3.7 billion accounts

6    that are stored in databases about those 200 million Americans.

7    We have -- we get 50 million updates a day.  The number of

8    calls with people saying this is wrong on their credit report,

9    it's big.  And it's going to be big when you're housing that

10   kind of data.

11        But you're also going to learn that without housing that

12   kind of data, you can't go in and buy a car the same day; you

13   can't get a house in a reasonable amount of time; a bank can't

14   make a decision on a loan.  So we house a lot of data, and we

15   do have to have reasonable procedures to ensure maximum

16   possible accuracy.  That's the exact standard.  And so the

17   question is going to be:  Are we checking that data?

18        You're going to learn that what we do when we check that

19   data is we look at a furnisher like PHH, and we check -- we

20   check them out, we audit them, we check the data that's coming

21   in; not at the individual level, but at the whole book level

22   that's coming in for all of their consumers, for abnormal

23   things.

24        You're going to learn that, in addition to that, when we

25   learn about things, so if somebody comes in for a dispute, we

Defendant's Opening Statement

1    do exactly what we believe the law requires us to do.  If the

2    consumer gives us subjective evidence, if Mr. and Mrs. Toler

3    attached a mortgage modification, actual agreement, when they

4    made their Internet dispute or when they called -- not

5    called -- sorry -- they never called -- when they sent the

6    letter, we would have to look at that, we would have to

7    evaluate that, and we would have to determine whether there's

8    objective evidence to believe them.

9         If they only say, "Not mine," or, "The amount is wrong,"

10   our procedures are to go to the furnisher, who is required by

11   law to report accurate information, and then they have to

12   certify under law that what they are reporting to us is

13   accurate.  They sign it and at the bottom of the sheet it says

14   that they are certifying by law.  And you're going to learn

15   that that's what happened here.

16        The Tolers contacted Experian in August of 2010 when PHH

17   was reporting their mortgage as paid in full.  And Mr. Toler

18   said in that Internet dispute, "My payment shouldn't be $3,000.

19   It should be $1,800."  And in response to that -- that's all

20   that's said.  And in response to that, Experian sent to PHH,

21   "This is what Mr. Toler is saying.  Is this right, or is this

22   wrong?"  And when we get the response back, we have to evaluate

23   that.  But think about how we evaluate it.  If we took every

24   consumer's word that this was wrong and that's all we had, no

25   other objective evidence, would anybody have bad credit?  So as

Defendant's Opening Statement

1    we look at that, we have to look at that.

2         We then do what the law requires next, which is to say:

3    If there's a dispute between the creditor and the consumer, we

4    have to give the consumer the right to put their side of the

5    story on the credit report.  And you're going to see that every

6    time we responded to Mr. and Mrs. Toler, we gave them that

7    opportunity, and they never called, they never wrote, they

8    never said, "Here's what we want on our statement."  They never

9    responded to that.

10        You're also going to learn that in 2011, the second time

11   that they contacted Experian, they contacted by the Internet,

12   and the very next day they sent two letters.  For Mrs. Toler,

13   we did the investigation.  You're going to learn that for Mr.

14   Toler, we didn't do the investigation because we had already

15   done one for him in August.

16        You're going to learn that under Experian's policies and

17   procedures, the very first time we were asked about in this

18   case, we said that was probably a mistake.  It's an agent

19   that's getting the mail and they're looking at it and they are

20   comparing it to the past reinvestigation, and says, "Is this

21   substantially the same, or is it different?"  That agent said,

22   "It's substantially the same," and they shouldn't have.  And we

23   acknowledge that.

24        What they should have done is say, "It's slightly

25   different because instead of disputing the amount of the

1   payment, we're now disputing whether or not they're current."

2   Because, you see, somewhere between August of 2010 and November

3   of 2011, PHH changed the reporting and said they are now

4   delinquent, which you're going to learn, through this

5   modification period, which is a big period in the United States

6   when people were starting to get foreclosures left and right,

7   it was normal for people to enter into a modification and then

8   not succeed in that modification, and the old terms come back.

9   You're going to learn that that's what was going on.

10       So PHH started reporting them negative.  And when Mr.

11  Toler said, "We shouldn't be reported negative," Experian

12  should have treated it differently.  But you're also going to

13  learn, it wouldn't have made a difference because when we

14  investigated at the very same time Mrs. Toler, if PHH would

15  have told us something different and told us to do something

16  different for Mrs. Toler, it would have applied for Mr. Toler

17  as well.  And so while we didn't do exactly what we want to

18  under our procedures, and we didn't make the best choice there,

19  it wouldn't have made a difference in this case.  It wouldn't

20  have affected whether or not the Tolers have any mental anguish

21  in any form or fashion.

22       Now, Mr. Wooten made a big deal "after the litigation."

23  Okay.  You're going to learn that PHH was sued in this case,

24  too.  You're going to learn that they are still today saying

25  that we're reporting it the right way.  You're going to learn,

Defendant's Opening Statement

1   through the course of this case, that in May of 2011, Experian,

2   right after they got sued, we get the lawsuit in, we start to

3   evaluate it, we immediately say, "Hey, we need to check back

4   with the furnisher," who is a defendant in this case, by the

5   way, so we're talking to their lawyers.  We check to see is it

6   reporting right.

7          And he kept talking about a souped-up email.  This is a

8   very, very complicated computer system that has tremendous

9   amounts of information in codes.  So when it goes up on the

10  screen in a little while, it's going to be gobbledygook, and

11  we're going to try our best to make it clean and clear and

12  understandable.  But it's not souped up e-mails.  It's a lot of

13  information about whether or not you're current, whether you've

14  paid your monthly payments over and over again, et cetera.

15         After the litigation, PHH said:  We want to update the

16  account.  We want to update it to show that a modification did

17  take place.  Despite the fact that there were foreclosure

18  notices, despite the fact that we had a dispute back and forth

19  whether the modification took place, we want to update it to

20  show that we actually did accept them for a modification.  And

21  so we updated it.

22         But what you're also going to learn is, when we updated it

23  and did exactly what PHH told us to do at that point in time,

24  they updated it to show that the Tolers were current to May

25  of 2011 and haven't made a payment since.  And what you're

Defendant's Opening Statement

1    going to learn is that's true.  And when the data is accurate,

2    there's not an issue.

3        What you're going to learn is the Tolers -- in March

4    of 2011, PHH rejected their payment and said, "We're

5    foreclosing on your house."  And PHH then fixed that.  And

6    instead of the Tolers making the payment and sending it to PHH,

7    they said, "Well, you told us not to pay."  But you're going to

8    hear phone calls where they say, "You need to get that payment

9    in."  You're going to hear phone calls that say, "The stop has

10   been lifted.  You need to send your payment."

11       And what you're going to learn is they're in this

12   courtroom today asking for mental anguish against us for

13   reporting, not the person that they had the fight with about

14   their home, but us for reporting what they said and continued

15   to report it while they live in the house for free and have

16   from March of 2011 until today.  And so it is reporting on

17   their credit report exactly what PHH has said is accurate here,

18   at this point in time, which is from after March of 2011

19   forward, they haven't made a payment.  That's what it says.  It

20   says the terms of the modification, but it says they haven't

21   made a payment.  And that's true.

22       And you're going to learn that when we're stuck, us in the

23   middle like this, we do what the law requires us to do.  We

24   allow them to tell both sides of the story on the credit

25   report.  We allow them to put their statement.  But if we just

Defendant's Opening Statement

1    started deleting things when somebody says it's wrong, it

2    wouldn't put us in a position where we're reporting accurate

3    information.

4         And the last thing I'll say is that we make our money off

5    of reporting accurate information.  Lenders want to make loans.

6    You're going to learn that.  Lenders want to give credit cards.

7    They want to give mortgages.  They have to make wise decisions.

8    And if we don't report accurate information, they can't make

9    wise decisions.  And if they believe we're not reporting

10   accurate information, they are not going to get our reports,

11   they are going to get somebody else's.  So the last thing we

12   want is to report wrong information.  And, certainly, the last

13   thing we want is to harm anybody like Mr. and Mrs. Toler.  What

14   we're really trying to do and what we're stuck in the middle of

15   doing here is trying to comply with our obligations under the

16   law.

17        I thank you for your time, and I hope that we put on the

18   evidence in a way that's understandable and easy for you to

19   digest.  I really do appreciate your service.

20        Thank you.

21        THE COURT:  Thank you very much.

22        Ladies and gentlemen of the jury, we're going to take our

23   lunch break now.  I'm probably going to give you until

24   1 o'clock.  There's some things I need to talk about with the

25   attorneys out of your presence.  We're not talking about you, I

1  assure you.  But there's some things I need to address with

2  them.

3      If you do go outside the courthouse, be sure and wear your

4  juror button.  Sallie says they are in the jury room.  Make

5  sure you have it on.  Don't talk to anyone about this case.

6  Don't talk to each other about this case or allow anyone to

7  discuss it with you.  If you do -- someone attempts to discuss

8  it with you, you need to advise me.

9      We're going to remain seated and escort the jury out of

10  the courtroom.  And we'll see you at 1 o'clock.

11      Remain seated, please, until the jury is out of the room.

12      (Jury exits the courtroom.)

13          THE COURT:  Let the record reflect it is now 11:46.

14  Anything anybody wants to place on the record out of the

15  presence of the jury?  What I don't need you to do when this

16  matter is appealed to the Eighth Circuit is to say:  We never

17  had a chance to make a record.

18          MR. WOOTEN:  No, sir, Your Honor, not from the

19  plaintiffs.

20          THE COURT:  Mr. Fuchs?

21          MR. FUCHS:  No, sir, Your Honor.

22          THE COURT:  You had talked about a stipulation

23  earlier, and I think I was to read that to the jury after

24  opening statements.  Have y'all made any progress in that?

25          MR. FUCHS:  Do we have a hard copy of that?

1          THE COURT:  Listen, I'm going to give you some time.

2      But if I am to read it, you need to get it to me before

3      1 o'clock.  I may need to rehearse a little before I read it.

4          MR. WOOTEN:  Your Honor, may we send that to your

5      clerk by email --

6          THE COURT:  That would be perfect.

7          And your witnesses are going to be?

8          MR. WOOTEN:  We're going to begin with the Tolers.

9      Your Honor, we'll start with Mr. Toler.

10         THE COURT:  That's fine.  You've got an expert.  Are

11     you going to try to get him on early or late or --

12         MR. WOOTEN:  I've spoken with Mr. Fuchs about this.

13     I've basically given him all of our witnesses through Thursday

14     morning.  We plan on putting Mr. Hendricks on as our last

15     witness.

16         The one issue, Your Honor, we did mention is Ms. Hughes,

17     she's their corporate designee for 30(b)(6) purposes for

18     presence at the trial.  She's also given an expert rebuttal

19     report in this case.  And Mr. Fuchs has suggested maybe they

20     should have the opportunity to call her a second time at the

21     end of Mr. Hendricks' testimony as a rebuttal.  So that's

22     somewhat unique for me.  I've never been in a situation --

23         THE COURT:  I don't think I have either.

24         MR. WOOTEN:  I'm not really sure it's improper, but

25     it's so strange, I don't know that I even have the right way to

1    phrase the objection to that.  We did have a separate designee

2    in the deposition.  So we will have the issue, if we have a

3    contradictory statement, we'll have a different talking head in

4    the impeachment than they have sitting on the stand.  So it is

5    a somewhat unusual situation, and I defer to your seasoned

6    experience on that because I've never had to address this issue

7    before.

8              THE COURT:  I'll just say let's just approach it if it

9    becomes a problem.  That's all I know to do.  Or when you think

10   it is a problem, let me know.

11             MR. WOOTEN:  Thank you, Your Honor.

12             THE COURT:  I have given you my advice for lunch.  And

13   at some point -- you don't have to do it today if you've got

14   things to do or whatever.  But you really ought to see if you

15   can hike up the steps over there, especially those who live

16   here, it's a worthwhile experience, I think.

17        We have jurors from previous panels who dine there often.

18   You know, it's not only inexpensive, it's also very good, and

19   it's also, I think, very rewarding to the patients and also to

20   those in attendance.

21        But if you think of anything between now and 1 o'clock

22   that you need to place on the record, get with the court

23   reporter and we'll take care of it.

24             MR. WOOTEN:  Thank you, Your Honor.

25             THE COURT:  Thank you very much.


                    Judith A. Ammons, RPR, CRR, CCR
                      United States Court Reporter

1      (Recess from 11:51 a.m. until 1:05 p.m.)

2           THE COURT:  I think we've forgotten the jury.

3      Is there something we need to place on the record?

4      I've got, it looks like, 33 proposed stipulations?

5           MR. WOOTEN:  Yes, sir.  That was one of the issues.

6      And we agreed to those.  And then we had an issue that we're

7      going to have to address in our testimony related to some of

8      the comments that were made.  And so Mr. Fuchs and them are

9      coming in.  We haven't had a chance to talk about it.  We

10     realized it as we were getting ready to put on our witness.

11          In the opening, Mr. Fuchs mentioned the Tolers' basically

12     "sort of a free house" argument that we talked about in the

13     motions in limine.  So Mr. Toler is going to have to explain

14     that.  I mean, it's very prejudicial.  So what we're trying to

15     ascertain is some instructions from the Court about how to

16     explain to the jury that the claims against PHH were resolved,

17     and he's going to have to explain that they had escrowed the

18     money for all of these payments during the whole period of time

19     of this dispute, or something to that effect.  Because,

20     basically, the opening statement was, you know, the Tolers

21     wanted a free house and they're living in a free house and they

22     don't want to pay their bills.  And that's very prejudicial.

23     And it was part of our concern in the motion in limine.

24          MR. FUCHS:  Your Honor, a brief response.  I sent an

25     email to both Mr. Wooten and to PHH's counsel and said, "If

1   this case has been resolved, please let us know immediately how

2   to report -- jointly together how to report the Tolers'

3   mortgage," and --

4           THE COURT:  I understand.

5           MR. FUCHS:  -- they responded, "No."

6           THE COURT:  We're past that.  Now I'm concerned about

7   what we do with the jury and the comments that have been made.

8   Well --

9           MR. WOOTEN:  And, Your Honor, we may can come up with

10  a stipulation.

11          THE COURT:  What if I told them, you know, "The claims

12  against PHH have been resolved and they are not to be

13  considered by you in any way"?  We certainly did that in the

14  opening statement, I thought.

15          MR. WOOTEN:  Right, except now that we've had sort of

16  the poison pen in with this free house argument, I mean, at

17  some level I need to have the Tolers be able to explain that

18  they were always financially accountable, and part of the

19  underlying condition was they never miss a payment.  And so,

20  you know, to say now:  Well, they want a free house and are

21  living in a house for free, their position is there was a

22  dispute between PHH and the Tolers.  And then they say:  Well,

23  the Tolers want a free house.  And that was never the argument.

24      So my intention, Your Honor, if I -- just my druthers, I

25  would just have Mr. Toler say that he's resolved his case with

1    PHH, and that at all times this dispute was ongoing, he always

2    was escrowing his mortgage payment and he was not ever seeking

3    a free house.  And that would be like the first question we

4    would ask him and then we'd just move on.

5              MR. FUCHS:  Your Honor, he testified in his deposition

6    he's not actually escrowing anything.  He's putting it into a

7    savings account.  We'll cross-examine him on that point, but --

8              THE COURT:  You can.  I'm going to let him ask those

9    questions, and if you need to cross-examine, you certainly can.

10             MR. FUCHS:  And that includes the timing of the

11   tentative settlement?

12             THE COURT:  That will be fine.  But don't call it a

13   settlement.  I mean, I think that does further poison the deal.

14             MR. FUCHS:  We do have the followup issue, which is,

15   they are still telling us to report it as we are right now.

16   And we have asked both sides for an answer, and they literally

17   said, "Here is the answer," both of them together, they said,

18   "This is final" --

19             THE COURT:  I understand, but, you know, I'm not the

20   one you need to convince.  You've got a jury you need to

21   explain this to.  But I think that's the way you handle it.

22        How do you want to do the stipulations?  Do you want to

23   read them, or do you want me to read them, or do you want to

24   read them together?

25             MR. WOOTEN:  I'm fine with Your Honor reading them if

1    you're comfortable with that.  I don't need any more time in

2    front of the jury to read those types of things, Your Honor.  I

3    don't want them to tire of me.

4                THE COURT:  You want me to read them?  Is that the

5    agreement?

6                MR. FUCHS:  Yes, Your Honor.

7                THE COURT:  I'll read them.  And then I guess can we

8    call this just Court's Exhibit No. 1 or something?  It will be

9    admitted.  Any objections to that, admitting the stipulation?

10               MR. WOOTEN:  Your Honor, as long as it doesn't throw

11   off anybody's numbering, I don't care how you want to get it in

12   the record.

13               THE COURT:  No.  This is my first exhibit, Court's

14   Exhibit No. 1.  And hopefully, if things go as I plan, I won't

15   have any more.

16               MR. WOOTEN:  All right.  So if that's the agreement,

17   we'll -- so when the jury comes in, you're going to read the

18   stipulations, we'll call Mr. Toler and ask him those couple of

19   questions, and move on with what we intend to start with?

20               THE COURT:  I understand.  But is he going to be your

21   first witness, in any event?

22               MR. WOOTEN:  He will, Your Honor.

23               THE COURT:  How long do you think he's going to be?

24               MR. WOOTEN:  We were talking about that.  We've got,

25   you know, a couple of these calls we've got to play that relate

1     to what was going on and what he was -- you know, the context

2     issues, PHH.  And they also want to play a couple of them that

3     relate to the ones where there's questions about making

4     payments or not and what's the status of the mod.  But I think

5     we can finish both the Tolers this afternoon.  That's my goal.

6          THE COURT:  Have we checked out the sound system?  And

7     the fact that it worked yesterday, remember, doesn't mean it's

8     going to work this afternoon.

9          MR. WOOTEN:  I did not leave at the break and we did

10    check it.  It was working awhile ago.

11         THE COURT:  And you think that means it'll work in a

12    few minutes?

13         MR. WOOTEN:  It's a roll of dice, Your Honor, roll of

14    dice, but we feel good about our chances at the moment.  We're

15    not going to Oaklawn tonight, but we feel pretty good about

16    this.

17         THE COURT:  Do you have anything further before we

18    bring the jury in?

19         MR. FUCHS:  Your Honor, if I may.  On the calls

20    themselves, I learned from Mr. Wooten, during the middle of the

21    break, that those have been edited now.  What we had was the

22    full version of each call on their exhibit list.  And they are

23    playing a shorter version.  He has promised to give me the

24    transcripts of what they're playing so we can see the

25    difference.  So if I need the optional complete list, I will

1    try to do it.

2              MR. WOOTEN:  And let me make this statement to Your

3    Honor.  Chris is here, he was helping us edit those; Annabelle

4    was working on it.  And there's two things we took out.  We

5    took out the very beginning where he says:  I'm Terry Toler.

6    My address is X.  My Social Security Number is Y.  My insurance

7    company is ABC, you know, the initial stuff.  And then the

8    pauses where invariably he gets put on hold almost immediately,

9    sometimes it's five minutes --

10             THE COURT:  Do they play the elevator music while he's

11   on hold?

12             MR. WOOTEN:  (Nodding head.)  So we took all of that

13   out.  So we have just the context of each conversation without

14   the initiation to try to shorten them.

15             THE COURT:  Do you have a transcript of those?

16             MR. WOOTEN:  We do.

17             THE COURT:  Can you give it to Mr. Fuchs?

18             MR. WOOTEN:  We can.  We can give them each one as

19   they pop up, and if there's anything he wants us to play --

20             THE COURT:  You may want to give it to him now so he

21   can't plead surprise.

22             MR. WOOTEN:  Yes, sir, we'll give him each of those.

23   I hope no one is surprised by those.

24        (Off the record.)

25             THE COURT:  Let's bring the jury in.  Y'all remain

Judith A. Ammons, RPR, CRR, CCR
United States Court Reporter

1    seated, please, until the jury is in the box.

2         (Jury enters the courtroom.)

3              THE COURT:  Good afternoon.  Y'all have a nice lunch?

4    I see some of you made the hike up the steps.  If you didn't

5    see the lobby, you need to do that, too.  You know, they've got

6    pictures of that building being erected.  It is a gorgeous

7    structure inside.  You need to go up the steps and at least

8    look around in the lobby and whatever.

9         We're very proud of that.  They do wonderful work, too.  I

10   think most of the crafts, pants pressing people, you know, the

11   dry cleaners, I think, most of those folks are trained over

12   there.  They also have a computer section.  They've got auto

13   mechanics.  And they do good work and train a lot of people who

14   become useful employees.  They also treat a lot of stroke

15   victims who are adults and whatever, and they do marvelous

16   work.  We're proud to have that, and I hope it continues.  But

17   the fact that you've been -- how many of you went?  That's

18   almost everybody.  The rest of you will have an opportunity the

19   next couple of days.  And did you talk to some of the patients

20   or the students?  Well, do that when you're over there, too,

21   because I think sometimes people don't talk to them and you

22   should.

23        We're going to start with the testimony in just a moment.

24   We'll take a break probably in the middle of the afternoon, but

25   if you need a break prior to that time, give me a hand sign or

1      signal of some sort, and I assure you we'll take a break.

2          There's an awful commercial about a juror who needs a

3      break and she's doing all she can to signal to the Court that

4      she needs a break, and he's not paying attention.  I assure you

5      I'll pay better attention to you than that.

6          The attorneys have done some good work over the past

7      several weeks, but they have entered into three pages, looks

8      like 33 stipulations, that is, they have agreed that if

9      testimony was presented, that this would be the testimony.  And

10     this is important.  I think it will substantially shorten the

11     trial, and there's some areas that we will not need to go into

12     with testimony because they are covered here.

13         I'm going to read these to you, but after I tell you that

14     I'm going to read them to you, you'll have a copy of these back

15     in the jury room with you.  This will be called Court's Exhibit

16     No. 1.  So it won't be a plaintiffs' exhibit, not a defendant's

17     exhibit.  It is my exhibit.  But having said that, both the

18     plaintiffs and the defendant have agreed to it, so it is a

19     stipulation, and it is as binding as if and though you heard

20     testimony from the witness stand on it.

21         Number 1.  Terry and Donna Toler's PHH Mortgage showed as

22     120 days past due as of November 2009 and December 2009.

23         Number 2.  Experian received information on or about

24     February 9, 2010, from PHH regarding Terry and Donna Toler.

25         3.  Experian received information on or about

1    May 13th, 2010, from PHH regarding Terry and Donna Toler.

2         4.   Terry Toler submitted an Internet dispute with

3    Experian on August 12, 2010, disputing the amount of the

4    monthly payment showing on the trade line with PHH along with

5    other dispute -- along with disputing other various accounts.

6         Number 5.   Experian received a carbon copy from PHH

7    regarding an ACDV from TransUnion on July 6, 2010.

8         Number 6.   In the August 12, 2010, Internet dispute, Terry

9    Toler informed Experian that the amount of the monthly payment

10   to PHH should be $1,801.

11        Number 7.   Experian sent an ACDV to PHH on August 12,

12   2010, conveying Terry Toler's exact dispute provided to

13   Experian regarding the trade line with PHH.

14        Number 8.   PHH responded to the August 12, 2010, ACDV sent

15   by Experian on September 2, 2010.

16        9.   The September 2, 2010, ACDV response sent by PHH to

17   Experian stated: "01-Account information accurate as of date

18   reported."

19        10.   The On Profile information contained within the

20   September 2, 2010, ACDV response sent by PHH contained the code

21   "CN" in the "Spec Comm Code" field.

22        Number 11.   The Special Comment Code "CN" designates a

23   loan modified under a government plan.

24        12.   PHH reported the PHH account as current from

25   May 13, 2010, to February 6, 2011.


                    Judith A. Ammons, RPR, CRR, CCR
                      United States Court Reporter

1       13.   On November 2, 2011, Experian received an Internet

2   dispute on Donna Toler's behalf stating that "we made all

3   payments to the credit agency through February of 2011."

4       14.   Experian sent an ACDV request to PHH on

5   November 2, 2011, conveying the information provided to

6   Experian on behalf of Donna Toler on November 2, 2011,

7   regarding the PHH account.

8       15.   PHH responded to the November 2, 2011, ACDV sent by

9   Experian on December 1, 2011.

10      16.   The December 1, 2011, ACDV response sent by PHH

11  stated:   "01-Account information accurate as of date reported."

12      17.   On November 3, 2011, Donna and Terry Toler mailed

13  dispute letters to Experian.  On November 17, 2011, Experian

14  responded to Terry Toler with a repeat dispute letter dated

15  November 17, 2011.

16      18.   Terry Toler's dispute letter dated November 3, 2011,

17  was classified as a "repeat" dispute by Experian.

18      19.   Experian was already conducting a reinvestigation of

19  the November 2, 2011, Internet dispute sent on behalf of Donna

20  Toler when it received the November 3, 2011, dispute on behalf

21  of Donna Toler.

22      20.   Terry and Donna Toler disputed the accuracy of the

23  information reported by PHH with TransUnion on or about

24  November 3, 2011.

25      21.   Terry and Donna Toler disputed the accuracy of the

1   information reported by PHH with Equifax on or about

2   November 3, 2011.

3           22.   PHH failed to respond to either of the disputes from

4   Equifax and TransUnion resulting in the deletion of the trade

5   line as mandated by the Fair Credit Reporting Act.

6           23.   On April 19, 2012, Experian sent an ACDV request to

7   PHH to verify all information on both Terry and Donna Toler's

8   trade line with PHH.

9           24.   PHH responded to the April 19, 2012, ACDV request on

10  May 11, 2012.

11          25.   The ACDV response submitted by PHH on May 11, 2012,

12  updated the balance of the account, the amount past due, the

13  scheduled payment amount, and the account history.

14          26.   PHH was a defendant in this lawsuit at the time it

15  responded to the April 19, 2012, ACDV request on May 11, 2012.

16          27.   PHH is a furnisher of information as contemplated by

17  FCRA Section 1681s-2(a) and (b).

18          28.   Credit grantors use Experian consumer reports in

19  connection with decisions to extend or deny credit to

20  consumers.

21          29.   On May 15, 2014, Experian sent an ACDV request to PHH

22  to verify all information on both Donna and Terry Toler's trade

23  line with PHH.

24          30.   PHH responded to the May 15, 2014, ACDV request on

25  May 22, 2014.

1       31.  The ACDV response by PHH on May 22, 2014, stated,

2    "01:  Account information accurate as of date reported."

3       32.  The account information reported on May 22, 2014, by

4    PHH included the same balance of the account, amount past due,

5    scheduled payment amount, and account history as the

6    May 11, 2012, ACDV response by PHH.

7       33.  PHH was a defendant in this lawsuit when it responded

8    to the May 15, 2014, ACDV request.

9       Those are the stipulations and you'll consider that as if

10   they had testimony from witnesses that established those facts.

11   And, again, this would be listed as Court Exhibit No. 1.  It

12   will be made available to you in the jury room.

13       Call your first witness, please.

14          MR. WOOTEN:  Your Honor, plaintiffs call Terry Toler.

15          THE COURT:  If you'll come around, sir, and stop about

16   right there and raise your right hand.

17       **TERRY TOLER**, **PLAINTIFFS' WITNESS, DULY SWORN**

18          THE COURT:  Mr. Toler, if you'll have a seat right

19   there, and speak in the microphone.  And, hopefully, we've got

20   water and fresh cups there if you need them.

21       Go ahead, sir.

22                     DIRECT EXAMINATION

23   BY MR. WOOTEN:

24   Q.   Terry, can you hear me okay?

25   A.   I can.

1    Q.   All right.  If you would, would you tell the ladies and

2    gentlemen of the jury your full name, please, sir?

3    A.   It's Terry Dale Toler.

4    Q.   And where do you currently reside?

5    A.   123 Hidden Eagle Terrace here in Hot Springs.

6    Q.   And how long have you been a resident of Hot Springs?

7    A.   About 19, 20 years.

8    Q.   All right.  The residence you currently reside in, is that

9    in the Eagle Rock Subdivision we heard some mention about

10   earlier?

11   A.   Yes.

12   Q.   And did you at some point in time obtain a loan from PHH

13   Mortgage for your home out there?

14   A.   Yes.

15   Q.   Was that approximately September of 2007?

16   A.   Correct.

17   Q.   All right.  And besides the work you did out in the

18   subdivision in Eagle Rock, what other type of work were you

19   doing in this time frame?

20   A.   I own a sports memorabilia company called All Pro

21   Classics.  And so we do major sporting events across the United

22   States selling autographed type memorabilia.

23   Q.   Do you do that with both college and professional

24   athletics?

25   A.   We do college, professional, and a number of different

1    sports, whether it's NFL, NBA, PGA Tour, those types of things

2    as well.

3    Q.   All right.  And you've been more or less self-employed

4    most of your adult life, right?

5    A.   I have.

6    Q.   And you've had -- you also have training as an accountant?

7    A.   I do.

8    Q.   And over the course of your adult life, did you have

9    opportunities to seek and obtain credit?

10   A.   Yes.

11   Q.   Had you always mostly been able to get the credit you

12   needed for whatever you were working on or whatever you wanted

13   to do?

14   A.   Yes.  I've always been able to get whatever credit we

15   needed.

16   Q.   All right.  With respect to the issues with PHH, you got

17   your loan initially in 2007.  When was the first time that you

18   began to consider doing something about that loan with respect

19   to maybe a refinance?

20   A.   It would have been around April, May of 2009.

21   Q.   All right.  And what were you hoping to do with the --

22   what was your plan with respect to the mortgage?

23   A.   I wanted to refinance.  Our interest rate was over

24   7 percent.  And after the financial crisis, the interest rates

25   had gone down considerably, and so I thought we could lower our

1    monthly payment down considerably if we could get a lower

2    interest rate.

3    Q.    So when you initially made contact with PHH, did you

4    suggest to them that you were interested in a loan

5    modification?

6    A.    I didn't.  I didn't think that a loan modification was

7    something we would even qualify for.

8    Q.    Had you ever been behind at that point in time?

9    A.    We had not.  We had made every single payment, we were

10   current on every payment through the entire duration of the

11   loan.

12   Q.    And was it PHH that suggested to you that maybe you could

13   qualify for a loan modification?

14   A.    Yes.

15   Q.    All right.  And did PHH suggest to you that you needed to

16   be in default or delinquent to get a loan modification?

17   A.    They didn't.

18   Q.    All right.  So once you went through talking to them about

19   the modification, did you decide to pursue that issue?

20   A.    Well, that's what they recommended.  And it seemed like it

21   was about the same as refinancing because they would lower the

22   interest rate down considerably.  And so, you know, we were

23   open to the modification or the refinance.  But they were

24   really pushing us towards the modification.

25   Q.    Now, we heard something in the opening statement that

1    basically you guys were -- during this period of time you got

2    into this dispute with PHH, that you had been living in your

3    house for free and kind of wanted a free house -- was sort of

4    the insinuation.  Was there ever a point in time that you were

5    not ready, willing, and able to make your payments on your

6    mortgage?

7    A.   No.  That's absolutely not true.  I mean, we -- I can

8    assure you, we would have rather made our payments through this

9    period of time than going through what we went through.

10    Q.   All right.  And during the period of time that you

11    actually had the dispute going on with PHH, were you setting

12    aside the money that you normally would have used for your

13    mortgage payment?

14    A.   Yes.  Once -- in 2011 in the summer, we pretty much lost

15    everything at that point, and we were really on the verge of

16    bankruptcy.  And so, you know, after five or six months of that

17    180 days past due, we had pretty much lost everything.  And so

18    we were -- we weren't setting aside the payments at that time.

19    But once we kind of got back on our feet, then we just started

20    setting aside the payments.  And our intention all along with

21    PHH was, "Let's get this resolved.  Fix our credit, and we'll

22    start making our monthly payment again just like we're supposed

23    to."  We didn't want a free house.  We didn't want to not make

24    our payments.  We -- Donna and I have made our payments our

25    entire marriage on time.  And we weren't looking for a free

1    house.  We weren't looking for a special consideration.  We

2    just wanted them to fix our credit.  And if they would fix our

3    credit, then we would start making our payments again.

4    Q.    And with respect to that issue, we know -- of course, you

5    and I and the parties that have been litigating this case know

6    that there are some calls that we're going to listen to talking

7    about this, and we'll get into that in the evidence, and

8    there's places where some PHH reps talked to you about sending

9    your payments in.  Did you get conflicting signals from PHH

10   about what to do with that?

11   A.    I did, because the way it started was in March of 2011,

12   they sent our payment back.  We actually made our payment on

13   time.  In March, they sent it back with a foreclosure notice

14   saying that we owed $57,000.  And I called them and they said,

15   "If you don't pay $57,000 within 30 days, we're going to

16   foreclose on your house."

17        And then the next month I get another letter saying that

18   we owe $27,000.  So I call in again, they say, "Well, it's not

19   57-, but it's 27,000.  And if you don't make $27,000 in

20   payments within 30 days, we're going to come and take your

21   house."

22        And then I had another person say that because we were in

23   foreclosure, there was a stop -- there was a stop on our

24   account so that we couldn't send any payments in.  If we sent

25   them in, they were going to send them back.  What they told me

1    was that unless we sent the full amount of that 57,000 the

2    first time, or 27,000 the second time -- unless we sent in that

3    full amount, anything less than that, they were just going to

4    send the payment back to us and we weren't going to be able to

5    make the payment anyway.

6         And then we had -- then I had one lady that I was talking

7    to that said, "Well, you can go ahead and start making your

8    payments again."  And I think this was a service rep out in

9    Mumbai, India, that said, "Yeah.  Go ahead and start making

10   your payments."  And I said, "Well, are you going to fix our

11   credit?"  She said, "Well, we've got problems in our system.

12   And as soon as we get our system fixed, we'll fix your credit."

13   And I said, "Well, fix our credit, and we'll start making our

14   payments again."

15        And so I really didn't know exactly what to do because I

16   had four or five different people telling me all of these

17   different things.  And Donna and I at that point thought we

18   were about to lose our house.

19   Q.   That's in the first part of 2011, correct?

20   A.   Correct.

21   Q.   All right.  And you've got a number of phone calls

22   recorded.  Is that all of the phone calls that you had with

23   PHH?

24   A.   It's not.  We called them 30 or 40 or 50 times.  We were

25   pretty desperate during that period of time.  And they kept

1    telling us, "It's not your fault.  We're going to fix it.  You

2    know, give us a couple of weeks."  So I would call back in two

3    weeks, and they would say the same thing, "We're escalating it

4    to a supervisor.  And we're going to fix it for you.  And it's

5    not your fault.  It needs a credit retraction.  And we're going

6    to escalate it to a supervisor.  And they'll send through a

7    credit retraction."

8          And so we just kept calling and calling and calling and

9    calling.  And in May, it was so ridiculous what I was being

10   told, I thought nobody would believe what these people are

11   telling me, so I said, "Donna, let's start recording these

12   phone calls, because, you know, I don't know if this is going

13   to end up in a lawsuit or whatever, but nobody is going to

14   believe what these people are telling us about the credit and

15   about being 180 days late and how they are going to fix it and

16   then they don't."  So we just started recording the phone

17   calls.

18   Q.    All right.  And obviously the Experian dispute that went

19   on with PHH was a significant issue for you, especially

20   in 2011, right?

21   A.    Yeah, it was a huge issue.

22   Q.    I want to make clear to this jury.  You're not asking them

23   to award you a dollar or anything with regard to PHH?  You're

24   here about your problem with Experian, right?

25   A.    Correct.  We resolved the issues with PHH.

1  Q.  Now, let's talk a little bit about some of the actual

2  documents in the case and some of the things that were going

3  on.  And let me lay a little bit of a foundation there.

4       Will you explain to the jury kind of the nature of how you

5  and Donna manage your financial relations in the house, who has

6  primary responsibility for things like credit issues and stuff

7  like that?

8  A.  Sure.  Well, Donna used to be a special ed teacher when we

9  were first married out in Philadelphia.  And she wanted to quit

10  her job as a teacher and start becoming a homemaker.  So we

11  kind of made a deal that I would provide for the family and I

12  would make the money and I would provide for her so that she

13  wouldn't have to work, and her responsibilities were to do what

14  she loved to do, and that was to take care of the house, manage

15  the house, take care of the dogs and all of the things that

16  need to be done there.

17       And because of my experience in business, I handled the

18  credit and disputes and what loans we would get or what loans

19  we would get for our businesses or what loans we would get

20  personally or what credit cards we would get.  And we would

21  certainly talk about it.  We had lots of discussions about

22  those kinds of things.  And we -- it was a -- it's been a very

23  good working relationship.

24  Q.  So with respect to this problem with PHH, when you started

25  having issues with this loan modification and things didn't go

1    as you expected, did you start having things appear on your

2    credit report even back before 2011?

3    A.    Yes.  We had things on our credit report that were issues

4    prior to 2011 because February of 2011 was kind of when

5    everything blew up.  But PHH had reported us 180 days late, I

6    think it's three times before that; in November of 2009, May

7    of 2010, and then November of -- and then February of 2011.

8    And so this wasn't the first time they had reported us 180 days

9    late.  And so it -- I was able to get it fixed with them the

10   other times that they did it.  But I don't think that our

11   credit was reported correctly -- from 2009, when we first

12   started the loan modification, all the way to today, as far as

13   on the Experian account, it has always been wrong.  The payment

14   amount is not $3,100 as Experian was reporting.  It was $1,801.

15   And so -- and I think I would -- I would be in the best

16   position to know what my monthly payment is.

17        And so all of these different reporting -- I think at one

18   point they were reporting the terms as two years, and that was

19   incorrect, it was on a 30-year loan.  So I don't think there's

20   ever been a time from 2009 to today where PHH has gotten that

21   information correct on our report.

22   Q.    So when you began to see issues cropping up related to the

23   PHH trade line, did you send off for credit reports to look at

24   them or buy credit reports online from the various credit

25   bureaus?

1    A.   I did.  I did that anyway.  I always checked our credit

2    three or four times a year just to see if it was right, just to

3    see if everything was correct on our credit report.  So I was

4    always checking it, which is -- which is why I think that I

5    caught the May of 2010 where they started reporting us 180 days

6    late.  And so, yes, I would try to check our report

7    periodically to make sure it was correct, both mine and

8    Donna's, I would pull both of ours.

9            MR. WOOTEN:  Your Honor, I spoke to my colleague, he

10   has no objection to the exhibit we're about to offer.  It's

11   Number 84.  I want to display this to the witness and ask him

12   to identify it.

13           THE COURT:  What's the number?

14           MR. WOOTEN:  84.

15           THE COURT:  Go ahead.

16           MR. WOOTEN:  Put up page 1.

17   BY MR. WOOTEN:

18   Q.   Terry, I'm going to ask you to identify the document --

19           MR. WOOTEN:  -- that's going to come up on the screens

20   for you, ladies and gentlemen of the jury --

21           THE COURT:  Well, you need to show it to him before

22   you put it on the screen.

23           MR. WOOTEN:  Is it up?  She's going to flip the switch

24   on that.

25           THE COURT:  But don't show it to the jury until it's

1    admitted.

2             MR. WOOTEN:  Your Honor, unfortunately, I may need

3    to -- we may need to approach on that issue with the tech

4    person, the display to the jury -- she got the preview on that.

5             THE TECHNICIAN:  She gets the preview, the judge gets

6    the preview --

7             THE COURT:  Is there any objection to 84?

8             MR. FUCHS:  No, Your Honor.

9             THE COURT:  It's admitted.  Show it.  You can show it

10   now.

11        (Plaintiffs' Exhibit 84 received in evidence.)

12             THE TECHNICIAN:  Show it to the jury now?

13             THE COURT:  Yes, you can show it now to the whole

14   world.

15        (Off the record.)

16   BY MR. WOOTEN:

17   Q.   All right.  So, Terry, can you please tell the jury what

18   is represented here in page 3 of Plaintiffs' Exhibit 84?

19   A.   It looks like it is a --

20             THE COURT:  I think you can make it larger if you need

21   to.

22             MR. WOOTEN:  We're about to, Your Honor.

23             THE WITNESS:  It's a summary of the PHH credit

24   reporting on Donna Toler as of December 14th of 2009.

25   BY MR. WOOTEN:

1    Q.    And this is a report that you would have acquired for you

2    and your wife?

3    A.    Yes.

4    Q.    All right.  And at this point in time, were you just

5    having to go online and purchase these, or was this in response

6    to a specific issue?  How did you attain this one?

7    A.    Generally I went online and purchased them.

8    AnnualCreditReport.com gives you a free one every year, and so

9    I would oftentimes -- every year I would go and get a free one.

10   But this one looks like it's probably purchased.

11   Q.    All right.  So when you looked at this trade line in

12   December of 2009, were you paying under your modification

13   agreement?

14   A.    We were.

15   Q.    And were you making all of your payments?

16   A.    Yes.

17   Q.    All right.  And did you see things on this trade line that

18   you realized were inaccurate?

19   A.    Yes.

20   Q.    All right.  And was the payment amount correct?

21   A.    No.

22   Q.    All right.  And over under the Status column on the

23   right-hand side, were there issues there related to a reported

24   delinquency?

25   A.    Yes.  It's showing $21,801 past due as of December

1    of 2009.  It's showing 120 days past due as of December 2009.

2    Then it says November 2009, 60 days past due as of August 2009,

3    July 2009.  So, I mean, we weren't past due.  The payment

4    wasn't 3,114.  We weren't 120 days past due.  We've made every

5    single payment -- from the beginning of the time when we

6    secured the mortgage, through the modification, through this

7    date, we've made every single payment on time.

8    Q.    All right.  With respect to this exhibit, did this cause

9    you to go back to PHH to discuss with them these items?

10   A.    Yes.

11          MR. WOOTEN:  Your Honor, we would offer 84.

12          THE COURT:  It's been admitted already.

13          MR. WOOTEN:  Thank you.

14   BY MR. WOOTEN:

15   Q.    Let me show you what we have marked as 86.

16        (Mr. Wooten/Mr. Fuchs confer.)

17          THE COURT:  So this is 86?

18          MR. WOOTEN:  Yes.

19          THE COURT:  If there's no objection to 86, it will be

20   admitted.

21        (Plaintiffs' Exhibit 86 received in evidence.)

22          MR. WOOTEN:  Now, if you will -- Chris, will you show

23   us page 3 of that document as well?

24   BY MR. WOOTEN:

25   Q.    Do you recognize this document, Terry?

Judith A. Ammons, RPR, CRR, CCR
United States Court Reporter

Terry Toler - Direct

1   A.   Yes.

2   Q.   All right.  And is this your credit report for the same

3   time frame?

4   A.   Correct.

5   Q.   All right.  And the top trade line there, does that also

6   deal with your mortgage?

7   A.   Yes.

8   Q.   All right.  Does it have the same type of inaccurate data

9   on it?

10  A.   It does.  It looks like it's reporting identical to what

11  was being reported on Donna's.

12  Q.   Did you also check your credit with other bureaus?

13  A.   I don't know if I did at that time.  I may very well -- I

14  may very well could have.

15  Q.   All right.  And if you --

16         MR. WOOTEN:  Let me do this, Your Honor, if I could

17  publish just to the witness to refresh his recollection, is

18  that --

19      Madam clerk, is it possible to publish just to the Court

20  and the witness to refresh his recollection?

21         THE COURTROOM DEPUTY:  To the witness?

22         MR. WOOTEN:  Yes.

23         THE COURTROOM DEPUTY:  And to the Court also?

24         MR. WOOTEN:  Yes.

25      Chris, will you show him 85 just to refresh his

1    recollection?

2                THE TECHNICIAN:  Can I do that now?

3                MR. WOOTEN:  You should be able to.

4    BY MR. WOOTEN:

5    Q.   First of all, Terry, I've posted a document for just you

6    to see to ask you to refresh your recollection.  Does that

7    document help you recall whether or not you --

8                MR. FUCHS:  Your Honor, I believe everybody can see

9    it.

10               THE COURT:  I don't think the jury can see it.  They

11   can?

12               MR. WOOTEN:  I thought we had it set.

13               THE TECHNICIAN:  I've blanked it now.

14               MR. WOOTEN:  Your Honor, if I may be able just to

15   approach and show him that document, that would be faster --

16               THE COURT:  You can.  I think that would probably be

17   quicker.

18               MR. WOOTEN:  -- we'll avoid that snafu.

19   BY MR. WOOTEN:

20   Q.   I just want to show you this to refresh your recollection.

21   A.   Yes.

22   Q.   I'll go back to the podium.

23        So, Terry, having shown you the document I previously

24   marked that we're not offering as an exhibit, does that help

25   you refresh your recollection as to whether or not you inquired

1    with another credit reporting bureau about this issue?

2    A.    Yes.  I also checked TransUnion.

3    Q.    All right.  And did you also see the same type of

4    inaccurate data at that point?

5    A.    Yes.

6    Q.    All right.  And so did you initially go back to PHH with

7    regard to that issue?

8    A.    Yes.

9    Q.    All right.  And, ultimately, in that circumstance, were

10   you able to get what you considered to be an adequate

11   satisfaction of that issue?

12   A.    Yes.

13   Q.    And was your credit at that point actually corrected to

14   reflect appropriately that you are current on all of your

15   payments?

16   A.    Yes.  It didn't fix everything that was on there, but it

17   took it out of a derogatory status and past due and wasn't

18   showing 180 days late anymore.  But it didn't fix the payment

19   amount, things like that.

20   Q.    So there were some things that still remained that weren't

21   exactly accurate, but the things you were most concerned about

22   reflecting the major derogatory, those had gone away?

23   A.    Yes.

24   Q.    And so based on that, you proceeded on and there was a

25   period of time before you had any other issues?

1   A.   Yes.

2          MR. FUCHS:  Your Honor, Mr. Wooten is leading the

3   witness.

4          THE COURT:  Try not to lead.

5          MR. WOOTEN:  Yes, sir.

6   BY MR. WOOTEN:

7   Q.   All right.  Was there -- do you recall the next period of

8   time -- or do you recall how long it actually took you to get

9   your data straightened out during that time frame from the

10  December dispute?

11  A.   I think it was pretty quick.  I think they retracted it

12  within 30 days.

13  Q.   Okay.  So that seemed to move to your satisfaction?

14  A.   Yes.  And I wasn't seeking any credit during that time

15  anyway, so it wasn't causing us any particular problems, and

16  they corrected it.

17  Q.   All right.  Do you recall the next time that you had an

18  issue with respect to something you noticed related to the PHH

19  trade line?

20  A.   Yeah.  They did it again in May of 2010.  Just five months

21  later, all of a sudden, it's popping up on my report 180 days

22  or 120 days, depending upon which report, late again.

23          (Mr. Wooten/Mr. Fuchs confer.)

24          MR. WOOTEN:  There's no objection to 110, Your Honor,

25  so may we publish to everyone?

1          THE COURT:  You may.  And 110 will be admitted.

2          (Plaintiffs' Exhibit 110 received in evidence.)

3     BY MR. WOOTEN:

4     Q.    So in May of 2010 you said you had the same issue?

5     A.    Yes.

6     Q.    And you contacted PHH at that time?

7     A.    Yes.

8     Q.    Did you receive the document that's been marked as

9     Plaintiffs' Exhibit No. 110?

10    A.    We did.

11    Q.    All right.  And what's the date of that letter?

12    A.    It's May 13th of 2010.

13    Q.    All right.  And that came to you from PHH?

14    A.    Yes.

15    Q.    All right.  And did this letter indicate that they had

16    made a correction and a credit retraction on your behalf?

17    A.    Yes.

18    Q.    All right.  And was that as a result of that second issue

19    that you mentioned with respect to some derogatory reporting?

20    A.    Yes.

21    Q.    All right.  So in both of these instances, you felt like

22    PHH had handled the issue appropriately?

23    A.    Well, I was starting to get concerned because the middle

24    of 2010 we were starting to seek credit for businesses and

25    personal expansion and things along those lines.  Our sports

1   memorabilia business was expanding really rapidly in 2010.  And

2   so I was concerned that this had happened twice now in a

3   five-month period of time.  And even though they corrected it,

4   if I had actually gone out and been denied credit because of

5   that 180 days late reporting, then that could really, you know,

6   affect my ability to expand my business and to grow.  And I

7   wanted to make sure that this type of thing didn't happen

8   again.  So I wasn't really fully satisfied by getting that

9   letter.  And, in fact, I decided to really ramp up my disputes

10  to -- for both Donna and for me to, you know, see if we

11  couldn't get this resolved with PHH.

12  Q.   So after this occurred, did you make some efforts to

13  dispute the derogatory data that you had seen on your trade

14  line with the credit reporting agencies?

15  A.   I did.

16  Q.   All right.  Let me see --

17       (Mr. Wooten/Mr. Fuchs confer.)

18           MR. FUCHS:  No objection.

19           MR. WOOTEN:  That'll help us along.

20       Your Honor, we have no objection to Exhibit No. 112.

21       Chris, if we can have 112, please.

22           THE COURT:  It will be admitted as 112.

23       (Plaintiffs' Exhibit 112 received in evidence.)

24  BY MR. WOOTEN:

25  Q.   Is document number 112 -- do you recognize this document,

1    Terry?

2    A.   Yes.

3    Q.   All right.  Was this a document you received in response

4    to a dispute to PHH?

5    A.   Yes.

6    Q.   All right.  I'm sorry.  I said PHH.  This was a response

7    you received to a dispute that was filed with TransUnion?

8    A.   Correct.

9    Q.   Right.  And is this the status of your credit reporting as

10   of that dispute?

11   A.   Yes, but it's not corrected at that point.

12   Q.   All right.  So are you saying you had an issue, an

13   additional dispute at this point related to this one?

14   A.   Right.  It's showing past due of $24,915.

15   Q.   And does it also show an incorrect payment?

16   A.   Yes.

17   Q.   Does it list you as being delinquent still at that point?

18   A.   It does.

19   Q.   All right.

20   A.   And it's saying maximum delinquency of 90 plus days

21   occurred in March of 2010.  And, of course, we had made all of

22   our payments, you know, we were current through that period of

23   time.

24   Q.   All right.  So do you recall if you issued a dispute to

25   TransUnion on that date based on the credit retraction you

Judith A. Ammons, RPR, CRR, CCR
United States Court Reporter

1    received?

2    A.   I don't remember if it was on specifically that date, but

3    I do remember doing a dispute shortly thereafter for Donna's

4    account.

5           MR. WOOTEN:  So you said no objection to 113, Josh?

6           MR. FUCHS:  No objection.

7           MR. WOOTEN:  Your Honor, there's no objection to 113

8    either.

9           MR. FUCHS:  No objection, Your Honor.

10          THE COURT:  113 will be admitted also.

11       (Plaintiffs' Exhibit 113 received in evidence.)

12   BY MR. WOOTEN:

13   Q.   Terry, is document 113 a representation of the dispute

14   that you prepared for Donna on her TransUnion report?

15   A.   Yes.

16   Q.   All right.  And I believe it's problem number 3, if I'm

17   correct, is that the dispute that you reported to TransUnion

18   related to the PHH account?

19   A.   Yes.

20   Q.   All right.  And did you file with TransUnion an identical

21   dispute for yourself at that time?

22   A.   Yes.

23   Q.   All right.  And did you send both of those to TransUnion?

24   A.   Yes.

25   Q.   And did you receive a response related to this dispute?

1    A.    Yes, I believe we did.

2          (Mr. Wooten/Mr. Fuchs confer.)

3              MR. WOOTEN:   There's no objection to 118, Your Honor.

4              THE COURT:   118 will be admitted.

5          (Plaintiffs' Exhibit 118 received in evidence.)

6              MR. WOOTEN:   And, Chris, if you can publish 118 for

7    Mr. Toler.

8    BY MR. WOOTEN:

9    Q.    This is page 3 of the response you received to your

10   dispute, is that correct?

11   A.    Yes.

12   Q.    All right.   Now, does this response indicate now

13   appropriately that you're paying as agreed?

14   A.    Yes.

15   Q.    All right.   And that was a request that you had made in

16   your earlier dispute, correct?

17   A.    Correct.

18   Q.    All right.

19   A.    Payment's still wrong, but they are showing it paid as

20   agreed.

21   Q.    All right.   So based on these issues, did you continue to

22   monitor the PHH credit reporting?

23   A.    Yes.

24   Q.    All right.   And do you recall the next time you believe

25   you had an issue that required some action on your part related

1    to that reporting?

2    A.   Yes.  I sent a dispute to Experian in August of 2010 and I

3    sent a dispute to Equifax in August of 2010.

4         MR. WOOTEN:  Do you have a problem with 133 or 134,

5    Josh?  We'll do them separately obviously.

6         MR. FUCHS:  That's fine.

7         MR. WOOTEN:  Your Honor, there's no objection to 133

8    or 134.

9         We'll begin with 133.

10        THE COURT:  And they'll be admitted, 133 and 134.

11        (Plaintiffs' Exhibits 133 and 134 received in evidence.)

12   BY MR. WOOTEN:

13   Q.   We're going to show you Exhibit 133, Terry, and ask if you

14   can identify that for us, please.

15   A.   That is a dispute that I sent to CSC Credit Services.

16   Q.   And do you recognize CSC to be Equifax?

17   A.   Yes.

18   Q.   All right.  And does this also identify a problem with the

19   PHH trade line?

20   A.   Yes.

21   Q.   All right.  And did you send an identical dispute at this

22   time for Donna, or was this solely for you?

23   A.   I don't remember if I sent one for Donna or not.  I may

24   have, but I don't remember if I did.

25   Q.   Let me show you Exhibit 134 and ask you to identify that

1    for the jury as well.  There's also no objection.  Next to the

2    last one.

3         Can you explain to the ladies and gentlemen of the jury

4    what is represented here in Exhibit 134?

5    A.   This is the Experian reporting as of August 12th, 2010,

6    for me.

7    Q.   All right.  And did you identify some issues again related

8    to the PHH account at that time?

9    A.   Well, yeah.  I mean, almost everything is wrong on it.

10   That's what it's saying.  They are showing the terms as two

11   years, the monthly payment as $3,114.  They are showing the

12   recent payment of $6,228.

13   Q.   Let me stop you there.  Had you made a payment of $6,228?

14   A.   No.

15   Q.   All right.

16   A.   I have no idea where that number came from.  And I never

17   made a payment that I -- of $3,114 either.  Our payment at that

18   time was $1,801 and change, I think.

19   Q.   All right.  Did this cause you to file another dispute

20   with Experian?

21   A.   It did.

22        MR. WOOTEN:  Josh, do you have a problem with 135?

23        MR. FUCHS:  Your Honor, I object.  Counsel just said

24   "another dispute with Experian."  There hasn't been any

25   testimony that there's been any dispute with Experian at this

Judith A. Ammons, RPR, CRR, CCR
United States Court Reporter

1    point.

2              THE COURT:  I'm sustaining that objection.

3         Rephrase your question.

4              MR. WOOTEN:  I apologize.  I'm sorry.  And I'm

5    actually going to back up.  I need to drop back to another

6    exhibit I almost skipped over.

7         Do you have a problem with 135, the TransUnion response?

8              MR. FUCHS:  That's fine.

9              MR. WOOTEN:  There's no objection to 135, Your Honor.

10             THE COURT:  It will be admitted also.

11        (Plaintiffs' Exhibit 135 received in evidence.)

12   BY MR. WOOTEN:

13   Q.   Terry, we talked a moment ago about your dispute with

14   TransUnion.  Did you get a response from TransUnion related to

15   that dispute?

16   A.   Yes.

17   Q.   Is that represented in this exhibit?

18   A.   Yes.

19   Q.   And does it also cover your dispute related to the PHH

20   trade line?

21   A.   Yes.

22   Q.   Let me doublecheck that.

23   A.   Actually I don't see PHH listed on that.

24   Q.   Okay.  So this was another dispute that you had filed with

25   TransUnion on some other accounts, right?

1    A.   Right.

2    Q.   Okay.  All right.

3         MR. WOOTEN:  I apologize, Your Honor.  I marked the

4    wrong document there.

5    BY MR. WOOTEN:

6    Q.   When you saw the items on the Experian report that we just

7    talked about, the previous exhibit, 134, do you recall how you

8    chose to dispute at that time with Experian?

9    A.   I believe it was on the Internet.

10   Q.   Okay.  Do you recall whether or not at that time you had

11   the option to attach any type of documentation to your dispute,

12   or whether it was simply selecting buttons?

13   A.   There was -- there was no way that -- they didn't have any

14   mechanism to attach any documents to the dispute on the

15   Internet.

16   Q.   During this period of time, were you paying for some

17   service with Experian to monitor your credit report?

18   A.   Yeah.  And it started about then because I thought, you

19   know, this is -- this could potentially cause us some problems,

20   so I signed up with the Experian Triple Alert, I think is what

21   it's called, so that I could start monitoring my credit with

22   them every single month.  And they would send -- they were

23   supposed to send us alerts and things along those lines.

24   Q.   All right.  Up to this point, had you experienced any

25   significant disruption in your ability to access credit as

1    needed?

2    A.    Yes.

3    Q.    In August of 2010?

4    A.    Yes.  I was working on some credit for some real estate

5    that we were purchasing back in May of 2010.  And when PHH

6    began reporting us 180 days late in May of 2010, I put that on

7    hold until that could get fixed because I didn't want the bank

8    to run my credit with that 180 days on there because, you know,

9    I obviously wouldn't be able to get the credit.

10   Q.    And to be clear, at that point you had not actually issued

11   any dispute to Experian?

12   A.    Correct.

13   Q.    All right.  And that's not any element of damages you're

14   claiming today related to Experian?

15   A.    No.

16   Q.    When you made your online dispute did you get some type of

17   confirmation from Experian related to that?

18   A.    Yes.

19            MR. WOOTEN:  139 and 140, I guess, the same thing.

20            MR. FUCHS:  It's fine.

21            MR. WOOTEN:  Your Honor, 139 and 140 there's no

22   objection to.

23            THE COURT:  They'll both be admitted.

24        (Plaintiffs' Exhibits 139 and 140 received in evidence.)

25   BY MR. WOOTEN:


                    Judith A. Ammons, RPR, CRR, CCR
                      United States Court Reporter

1   Q.   Let me show you first the document we marked as 139.  Do

2   you recognize that document?

3   A.   Yes.

4   Q.   And can you explain to the jury what that is?

5   A.   That is an email back from Experian regarding the results

6   of the investigation that they did from the dispute that I sent

7   in with a link for me to be able to go in and look at the

8   results of the investigation.

9   Q.   All right.  Let me show you the document we marked as

10  140 --

11        MR. WOOTEN:  -- that there's also no objection to,

12  Your Honor.

13        THE COURT:  It's already been admitted.

14  BY MR. WOOTEN:

15  Q.   Do you recognize this document as the cover page of that

16  document you received?

17  A.   Yes.

18        MR. WOOTEN:  All right.  Let's look at the first page

19  for a minute, Chris.

20        On this first page, down in the middle --

21        THE COURT:  First page of 140?

22        MR. WOOTEN:  140, yes.

23        THE COURT:  Okay.  Go ahead, sir.

24        MR. WOOTEN:  Sorry, Your Honor.

25        If you'll look at the middle column at the last entry

1   there -- the bottom, Chris.  That's fine.

2   BY MR. WOOTEN:

3   Q.   This is a list of your disputes, correct?

4   A.   Correct.

5   Q.   And those are your responses?

6   A.   Yes.

7   Q.   All right.  And does this indicate that anything changed

8   with respect to your PHH account?

9   A.   It did not.

10            MR. WOOTEN:  141, Josh.

11            MR. FUCHS:  That's fine.

12            MR. WOOTEN:  There's no objection to 141, Your Honor.

13            THE COURT:  It will be admitted.

14       (Plaintiffs' Exhibit 141 received in evidence.)

15            MR. WOOTEN:  We'll flip over to page 4 of that, Chris,

16   please.  That's it.

17   BY MR. WOOTEN:

18   Q.   Can you identify this document for the jury, please, Mr.

19   Toler?

20   A.   Yes.  It's a copy of my credit report on September 3rd,

21   2010, with Experian.

22   Q.   All right.  And is this the trade line that you were

23   provided in this credit report for PHH also that we've

24   highlighted on the screen?

25   A.   Yes.

1    Q.   All right.  Are there some inaccuracies there?

2    A.   Yes.  The same inaccuracies are there that we talked about

3    earlier, that the terms are two years, the monthly payments

4    3,114, a recent payment of $6,228.  And then it says, "This

5    item was verified on September of 2010 and remained unchanged."

6    And that sentence really kind of threw me for a loop because it

7    was, like, how did you verify that our payment was 3,114 and

8    our terms were two years and our most recent payment was 6,228?

9    "Verify" says to me that I went and I looked at it and I

10   investigated it and I verified that it was right.  And so I

11   really began to get concerned about my credit at that point.

12   Q.   All right.  Up to this point, you mentioned you had

13   postponed the real estate deal that's not a part of this case.

14   Had you had another issue at this point where you had a denial

15   of credit?

16   A.   I did not --

17          MR. FUCHS:  Your Honor, excuse me.  We're still at the

18   same point -- he testified about August of 2010, we're now

19   barely into September of 2010.  So we're still at the same

20   spot, and the timeline is still the same.

21   BY MR. WOOTEN:

22   Q.   Okay.  There's been no difference then, is that fair?

23   A.   That's correct.

24   Q.   All right.  We'll move on to the next point.

25          MR. WOOTEN:  142.

1           MR. FUCHS:  That's fine.

2           MR. WOOTEN:  Your Honor, 142 there's no objection to.

3           THE COURT:  142 will, likewise, be admitted.

4       (Plaintiffs' Exhibit 142 received in evidence.)

5   BY MR. WOOTEN:

6   Q.   Are you able to identify what document 142 is, Terry?

7   A.   Yes.  That's a summary of my report for CSC, which I

8   believe is Equifax, and it's a copy of the credit report for

9   me.

10  Q.   All right.  And was this document received in response to

11  an earlier dispute?

12  A.   It may have been.  I don't know if it was in response to a

13  dispute, or if it was something I pulled online, but I'm

14  thinking it's probably a response to a dispute because I'm

15  not -- I don't believe this is the format that you get when you

16  purchase it online.

17          MR. WOOTEN:  Will you show us page 1, please?

18  BY MR. WOOTEN:

19  Q.   Let me show you page 1 of that document, Terry, and see if

20  that helps refresh your recollection.

21  A.   Yes, that's the response to the dispute.

22  Q.   All right.  And so were you concerned about anything

23  related to the PHH trade line when you reviewed it in this

24  document?

25  A.   I was.

Terry Toler - Direct

1   Q.   Can we summarize those concerns by saying they are the

2   same issues you had notated about the previous credit report?

3   A.   Yes.

4   Q.   All right.  Do you recall the next time that you

5   recognized an issue related to the PHH trade line after that

6   September 2010 time frame?

7   A.   Yes.  The next issue was February of 2011.

8   Q.   All right.  Do you recall whether or not you purchased or

9   reviewed an Experian consumer disclosure in December of 2000?

10          MR. FUCHS:  2000?

11          MR. WOOTEN:  Sorry, Your Honor.

12  BY MR. WOOTEN:

13  Q.   2010?

14  A.   December of 2010 did I review an Experian report or pull

15  an Experian report?

16  Q.   Yes.

17  A.   I may have.

18          MR. WOOTEN:  161.

19          MR. FUCHS:  No objection.

20          MR. WOOTEN:  Your Honor, 161 there's no objection to.

21          THE COURT:  It will be admitted as 161.

22      (Plaintiffs' Exhibit 161 received in evidence.)

23  BY MR. WOOTEN:

24  Q.   And do you recognize this document?

25  A.   Yes.

Judith A. Ammons, RPR, CRR, CCR
United States Court Reporter

1    Q.   Can you tell the jury what that is?

2    A.   This is my credit report for December 15th of 2010,

3    Experian report.

4    Q.   All right.  Did it have the PHH credit reporting on this

5    one?

6    A.   Yes.

7             MR. WOOTEN:  And if Chris will highlight this trade

8    line for us so we can see it a little bit better.

9    BY MR. WOOTEN:

10   Q.   How was the reporting with respect to this exhibit?

11   A.   Well, the terms are 30 years now, so that's correct.  The

12   monthly payment is still incorrect; it's $2,868.  And then it

13   says the same thing, "This item was verified on September 2010

14   and remained unchanged."

15   Q.   Did you have any idea why your credit report had that

16   statement on it?

17   A.   Well, I think it was because whenever I disputed it back

18   in August, they said that they verified the information.  Even

19   though the information was wrong, what I read that to mean is

20   that they verified that and that they are saying that this

21   information is correct.  But the monthly payment's now changed.

22   Now it's $2,868, which I have no idea where that number came

23   from.  It was 3,114.  Now it's 2,868.

24   Q.   What does it say with respect to your status on the

25   right-hand column?

Terry Toler - Direct

1  A.   It says, "Open/never late."

2  Q.   Is that an area where you previously had seen a

3  delinquency reported?

4  A.   Yes, seen past dues of 25,000 or -- you know, there were

5  several different reporting under that, but this was showing

6  "Open/never late," which was correct because we had never

7  missed a payment.

8  Q.   All right.  And in this time frame was there anything

9  significant happening with respect to your loan modification?

10  A.   Yes.  We entered into a second permanent loan modification

11  with PHH in December of 2010, and then it was filed with

12  Garland County, which finally finalized the permanent loan

13  modification.

14       (Mr. Wooten/Mr. Fuchs confer.)

15           MR. WOOTEN:  There is no objection to 160, Your Honor.

16           THE COURT:  160?

17           MR. WOOTEN:  That's correct.

18           THE COURT:  It will be admitted.

19       (Plaintiffs' Exhibit 160 received in evidence.)

20  BY MR. WOOTEN:

21  Q.   Do you recognize this document, Mr. Toler?

22  A.   Yes.

23  Q.   Can you tell the jury what this is?

24  A.   This is the Home Affordable Modification Agreement.  This

25  is the permanent loan modification of the refinance of our

1    home.

2    Q.   Did you file this document in the public records?

3    A.   I did not.

4    Q.   Was it filed by PHH?

5    A.   Yes.

6         MR. WOOTEN:  And, Chris, will you show us the sixth

7    page, please?

8    BY MR. WOOTEN:

9    Q.   Does the sixth page indicate you and your wife executed

10   this document?

11   A.   Yes.

12        MR. WOOTEN:  Would you show us page 7, please?

13   BY MR. WOOTEN:

14   Q.   Does page 7 indicate that PHH executed this document?

15   A.   Yes.

16        MR. WOOTEN:  Show us page 9 -- or the next page,

17   please.  I'm sorry.

18   BY MR. WOOTEN:

19   Q.   Do you recognize this page as accurately describing your

20   address for your home?

21   A.   Yes.

22   Q.   During this period of time in 2010, you had received some

23   contradictory signals from PHH about your loan modification

24   status, is that fair?

25   A.   Yes.

Terry Toler - Direct                    82

Q.    So around this time frame, did you actually know that this
document was recorded in December of 2010, or did you --

A.    I didn't.

Q.    How did you learn that this had been recorded in 2010?

A.    When I first met with Annabelle Patterson, who became our
lawyer in this lawsuit back in August of 2011, she pulled it up
on the -- on her computer and saw where it had been filed, and
that's the first time I learned that it had actually been
filed.

Q.    Do you recall any specific discussions with PHH about
whether it was recorded or not during 2011?

A.    Yes.  I believe that there were some -- on the recordings,
some representations made by PHH employees that, yes, it was
recorded, and that it was final and everything was as it should
be.

Q.    All right.  Leading into 2000 -- December of 2010, had you
had any major disruptions to your ability to access credit when
needed?

A.    No.  I got a loan in August of 2010, and I got a loan in
December of 2010 that I needed for my sports memorabilia
business.  So there wasn't a disruption of credit.  But I was
concerned about the payment amount because if I went to apply
for a loan somewhere, sometimes if the payment amount --
sometimes they make the loan based upon what your monthly
expenditures are.  And so I was concerned about the fact that

1    if it was reporting my monthly payment as a thousand dollars

2    more than what it actually was, I could be turned down for a

3    loan because my debt to income ratio might be too high.

4            MR. FUCHS:  Your Honor, I object to that whole line of

5    testimony.

6            THE COURT:  I think he's getting a little far afield.

7        Let's move on, please.

8    BY MR. WOOTEN:

9    Q.   With respect to the specific loan modification, you

10   mentioned the difference in the payment.  Can you tell the

11   ladies and gentlemen of the jury what your payment was under

12   the loan modification approximately?

13   A.   Yes, it went up from 1,801 to 1,803 and change, I don't

14   remember the exact amount, but it did go up by $2 when we

15   signed the final loan modification in November of 2010.

16   Q.   What was the next significant event related to your PHH

17   trade line that you became aware of?

18   A.   February of 2011.

19   Q.   All right.  What was significant about February of 2011?

20   A.   PHH started reporting us 180 days late again.

21   Q.   How did you learn that?

22   A.   I learned it because I called -- I was working on a loan

23   for our sports memorabilia business.  And I called them to get

24   the status, and they told me that I was denied.  And I may have

25   been denied credit before, I don't know, but that was the first

1  time -- it was kind of a shock.  It was, like, I don't -- I

2  don't know why we were denied.  "Why were we denied?"  And they

3  said, "You're 180 days late on your mortgage."  And I said,

4  "That's not true.  We're current on our mortgage.  We made all

5  of our payments."

6  Q.   And did you receive any correspondence from PHH in

7  February of that year related to the status of your loan?

8  A.   I don't remember getting -- yes, I do remember getting the

9  foreclosure notice in February of 2011, yes.  Not only was PHH

10  reporting us 180 days late, but we got a foreclosure notice.

11          MR. WOOTEN:  Josh, 179.

12          MR. FUCHS:  No objection.

13          MR. WOOTEN:  There's no objection to 179.

14          THE COURT:  It will be admitted.

15      (Plaintiffs' Exhibit 179 received in evidence.)

16  BY MR. WOOTEN:

17  Q.   All right.  Do you recognize the document we have marked

18  as 179?

19  A.   I do.

20  Q.   Is that the letter you just mentioned regarding the notice

21  of intent to foreclose?

22  A.   Yes.

23  Q.   Were you expecting to get this letter?

24  A.   No, not at all.

25  Q.   Was it shocking to you?

Terry Toler - Direct

1    A.   Yeah, it was very shocking.

2    Q.   Do you recall what you did with respect to trying to

3    figure out what happened once you got this letter?

4    A.   Yeah.  I called PHH, and I believe -- yeah, there's a 800

5    number, and I called the 800 number on the notice.

6    Q.   All right.

7         (Off the record.)

8         MR. WOOTEN:  Your Honor, we're going to take another

9    venture at technology.

10   BY MR. WOOTEN:

11   Q.   Did you record your phone call to PHH in February of 2011

12   after you got this notice?

13   A.   I did not.

14   Q.   You did not?

15   A.   I did not.

16   Q.   Let me show you a document, see if I can refresh your

17   recollection.

18        (Mr. Wooten/Mr. Fuchs confer.)

19        MR. WOOTEN:  You've got my 181.

20        I'm sorry, Terry.  I misrepresented that.  We actually got

21   that recording from PHH.  They recorded you.

22        And there's no objection to that, so if Your Honor's okay

23   with that, we'll play that.

24        THE COURT:  What's the number?

25        MR. WOOTEN:  181.

1          THE COURT:  And it's admitted as 181.

2   BY MR. WOOTEN:

3   Q.   So let's listen to the call.

4          (Plaintiffs' Exhibit 181 playing in open court.)

5          THE COURT:  Maybe we ought to play it again.

6          MR. WOOTEN:  We're going to pause and maybe get the

7   volume adjusted.

8          (Plaintiffs' Exhibit 181 playing in open court.)

9   BY MR. WOOTEN:

10  Q.   After having that conversation with PHH, what was your

11  feelings about the situation?

12  A.   My thought, it was going to be resolved within 30 days.

13  Q.   And was that similar to the experiences you had had in the

14  past related to these issues?

15  A.   Yes.  In May of 2010, when they started reporting us 180

16  days late, they fixed that, they retracted the credit within 30

17  days, so I thought they would do it again.

18  Q.   Is that what happened?

19  A.   No.

20         MR. WOOTEN:  Your Honor, we -- the lawyers need to

21  speak to you about a particular issue for a moment.  Is it an

22  appropriate time to do that?

23         THE COURT:  I think it is.  I'll see you at bar side.

24         You may stand, stretch, reach, yawn, talk softly, drink

25  water.  You can't leave.


                    Judith A. Ammons, RPR, CRR, CCR
                     United States Court Reporter

1          (Bench conference reported as follows:)

2          MR. WOOTEN:  Your Honor, we have come to our first

3    sort of loggerhead this afternoon.  I hope we don't have many.

4    This is a letter to Mr. Toler related to a credit denial.  We

5    would expect his testimony to be he received that in the

6    ordinary course of his business at his home address and it says

7    what it says.  Their objection to it is it's hearsay.  I think

8    certainly he is able to testify he received that document

9    through the mail and it related to a loan he previously applied

10   for.  And as they would normally say, the contents of the

11   document simply are what they are.  We're not offering them for

12   the truth of the matter asserted.  We're offering them for the

13   purpose of showing he received them in the ordinary course of

14   his affairs.  And the jury can give it whatever weight it's

15   entitled to.

16          THE COURT:  Assuming it's admitted, what's the impact

17   of that?

18          MR. WOOTEN:  It demonstrates there's a denial in 2011.

19   Of course, they are going to mention the fact it's

20   business-related.  We can go back and show the application.

21   The application actually was a personal guarantee on this loan

22   based upon a personal credit report.  So I can go back and show

23   the application as an earlier exhibit that I was hoping to

24   skip, and then show this response, and that would be the

25   purpose of showing it because he did not -- I'm sorry -- if he

1    were getting the business credit in the true sense of the word,

2    we wouldn't be talking about an Experian credit report.

3    There's -- this particular application has a specific section

4    that says he personally guarantees it and they authorize him to

5    pull his personal credit report.

6            MR. FUCHS:  Your Honor, it is about APC trying to

7    obtain credit.  It is hearsay.  It doesn't add anything beyond

8    his statement that he was denied a loan.  He can't speculate as

9    to why he was denied the loan.  The letter is not definitive.

10   He doesn't know.

11           THE COURT:  I'll not admit it.  You'll show -- what's

12   the exhibit?

13           MR. WOOTEN:  187.

14           THE COURT:  I'll show 187 as tendered and refused.

15       And, Sallie, do you keep those?

16           THE COURTROOM DEPUTY:  The court reporter does.

17           THE COURT:  I think she's got -- we're in a lot

18   of courts and they all do it differently.  We'll keep it.  This

19   way, she's got it.  But I'll show 187 is tendered and refused.

20       (Plaintiffs' Exhibit 187 tendered and refused.)

21           MR. WOOTEN:  And so with that ruling, Your Honor, my

22   objection -- I would like to get an instruction from you.  Are

23   you forbidding Mr. Toler to testify that he learned he was

24   turned down for credit on this 2011 loan?

25           THE COURT:  No.  This is what I'm denying.  I think he

1    can say he lost credit, couldn't get a loan, whatever, as long

2    as it goes to mental anguish.  I think that's where we are.

3              MR. MCLOON:  Counsel -- earlier in his testimony he

4    said the reason he was denied credit, and we would rather he

5    not testify to that.

6              THE COURT:  You don't get a choice.

7              MR. MCLOON:  He's not competent to say why he was

8    denied credit.

9              THE COURT:  You can explore on cross-examination,

10   whoever does that.

11         How much longer were you going to be?

12             MR. WOOTEN:  That's the thing.  I'm trying to --

13             THE COURT:  I know you're trying.  How much longer are

14   you going to be?

15             MR. WOOTEN:  There are a lot of these recordings.  I

16   would really rather not play them all if we can avoid it.  Or

17   what I would like to do, if we can get an agreement, is offer

18   them as cumulative evidence related to this issue so they can

19   be admitted, and then we maybe can select -- play one or two.

20   And then if the jury wants to go back and listen to them in the

21   back, they can listen to them.  If we sit and play them all,

22   that will take a pretty good amount of time.

23             MR. FUCHS:  I'm not comfortable with selective

24   cumulative --

25             THE COURT:  Let's play them.  I think, from experience

1    in this case, neither side is going to agree with anything the

2    other side suggests, so let's do it the hard way and play them

3    all if you need to.

4              MR. WOOTEN:  Thank you, Your Honor.

5         (Proceedings continuing in open court as follows:)

6              MR. WOOTEN:  My clients asked to have a bathroom

7    break, so could we have a break for maybe five or ten minutes

8    now?

9              THE COURT:  Do you know how much longer you're going

10   to be with him if you play all the tapes?

11             MR. WOOTEN:  I guess -- that's an unfortunate choice.

12   I would think -- 2:30 -- if we have to play every tape, we'll

13   probably be close to 4:00 finishing with him.

14             THE COURT:  We're going to take a 15-minute break at

15   this point.  Our smokers need to go outside.  Do we have any

16   smokers?

17             JUROR NO. 2:  No, but I can.

18             THE COURT:  We will remain seated until you're out of

19   the room.  Have a nice break.  I'll see you at ten minutes

20   until.

21        (Jury exits the courtroom.)

22             MR. WOOTEN:  Your Honor, we actually have an

23   agreement.  We've got a change of heart on that cumulativeness.

24   To save us some time, they've agreed to allow us to admit those

25   all cumulatively.

1          THE COURT:  Say that when we start back.

2          MR. WOOTEN:  Thank you, Your Honor.

3     (Recess from 2:39 p.m. until 2:52 p.m.; jury present.)

4          THE COURT:  We almost got it exactly on time.

5     My grandfather ran a short line railroad in south Arkansas

6     between El Dorado and Wesson.  There was a time when we only

7     had one train, but I assure you, we ran that one train on time.

8     I hope we can try to do that here, too.

9          Continue, please.

10         MR. WOOTEN:  Your Honor, we have reached a stipulation

11    in the interest of saving everyone some time.  And so what

12    we're going to do is offer a number of recordings as stipulated

13    for cumulative evidence rather than make the jury and the Court

14    sit through hours of recordings.  We have numbers for those

15    exhibits that we agreed to.

16         THE COURT:  And those numbers are?

17         MR. WOOTEN:  181, 183, 188, 199, 201, 207, 218, 226,

18    230, 236, 240, 242, 250, 265, 288, 296, 297, 307.  And there's

19    a couple more, Your Honor.  I'm sorry.  I'm stuck right there.

20    313, 373.  And, Your Honor, there was one that was -- actually

21    it's out of order on the numbers, it's 220.  But there is a

22    date range of these recordings from January of '12 back to

23    February of '11.  And I propose just to give these recordings

24    to the jury as part of the evidence and they can use them for

25    whatever weight they deem appropriate with your instructions,

1    Your Honor.

2              THE COURT:  Mr. Fuchs, is that your understanding,

3    your agreement also, sir?

4              MR. FUCHS:  We stipulate that those are all calls with

5    PHH, and not Experian.

6              MR. WOOTEN:  We so stipulate, Your Honor.

7              THE COURT:  Fine.  They are only PHH.

8        I accept the stipulation, and appreciation to the

9    attorneys involved in it, but they will be admitted as exhibits

10   you've just called out.

11             MR. WOOTEN:  Thank you, Your Honor.

12       (Plaintiffs' Exhibits 183, 188, 199, 201, 207, 218, 220,

13   226, 230, 236, 240, 242, 250, 265, 288, 296, 297, 307, 313, and

14   373 received in evidence.)

15             THE COURT:  Other questions?

16             MR. WOOTEN:  Yes.

17   BY MR. WOOTEN:

18   Q.   Terry, just to give a little context to those calls, is it

19   fair to say that everything we just stipulated to followed a

20   similar pattern to what the jury just heard?

21   A.   Yes.

22   Q.   Okay.  And did you ever get resolved with PHH through

23   those calls?

24   A.   No.

25   Q.   Eventually did you turn to credit disputing with the

1    credit bureaus to try to address the issue?

2    A.    Yes.

3    Q.    Do you remember when you began to make those disputes?

4    A.    November of 2011.

5    Q.    All right.  Now, for context, this period of time between

6    February of 2011 when this occurred and November of 2011, how

7    did this affect your family's credit and your life?

8    A.    Well, it was devastating.  I mean, starting in February,

9    they were reporting us 180 days late.  And that was on all

10   three credit reports.  And so, at that point, I was not able to

11   get credit for anything for -- what I had normally, routinely

12   been able to get in terms of credit for my businesses, or

13   credit personally, or lines of credit, or things like that, we

14   weren't able to get.  And our businesses depended upon having

15   revolving lines of credit so that we could buy inventory and we

16   can go do a new team.  And it was bad timing because we were

17   really expanding our sports memorabilia business right around

18   that time, and so we needed credit to be able to expand that

19   business and continue to grow that business.

20   Q.    You said it was very difficult in relation to your

21   financial life.  Can you explain how bad it got for the jury?

22   A.    Well, I had a payment due on the subdivision that was due

23   in January --

24              THE COURT:  Of what year?

25              THE WITNESS:  Of 2011.


                    Judith A. Ammons, RPR, CRR, CCR
                      United States Court Reporter

1          THE COURT:  Okay, sir.

2          THE WITNESS:  And it was a $16,000 payment.  It wasn't

3     a significant amount.  And we had applied for a line of credit

4     during that time to help expand and grow our businesses, and

5     then also to be able to use that money to make that $16,000

6     payment to kind of get through the real estate downturn.  And

7     because of all of the financial issues and inability to get

8     credit, all of a sudden we lost all of our contracts in the

9     sports memorabilia business.  We couldn't do the Texas Rangers

10    in April as we had planned.  We were to become their official

11    memorabilia dealer on April 1st.  We couldn't do the Indy 500.

12    We couldn't do the Kentucky Derby.  We couldn't do any of the

13    events that would create income for us.  And we couldn't make

14    the payments on the subdivision.

15    BY MR. WOOTEN:

16    Q.   Let me ask you this to be clear.  In that time frame, you

17    had not disputed this issue with Experian?

18    A.   Correct.

19    Q.   Okay.

20    A.   I had thought that PHH was going to fix it.  And that

21    became clear by September of 2011 that they weren't going to

22    fix it.

23    Q.   Is it fair to say that the nature of your personal affairs

24    required you to have short-term credit available?

25    A.   Yes.  We would turn over those lines of credit routinely,

1   you know, every 60 to 90 to 120 days.  And so we needed those

2   lines of credit to expand.  If we weren't expanding our

3   business, if we were just sticking with the contracts that we

4   had, then the cash flow would take care of the normal everyday

5   business.  But because we were growing our business and adding

6   new contracts and adding new teams, we needed the additional

7   cash flow to be able to add the inventory that's necessary to

8   go out and do those teams and those games.  And we had a lot of

9   opportunities available in the spring of 2011, and everything

10  just came to a screeching halt, and all of our income just went

11  to nothing.

12  Q.   All right.  Did you pull a credit report again sometime in

13  early 2011 after this came up?

14  A.   I did.

15  Q.   Did you pull an Experian report?

16  A.   Yes.

17       MR. WOOTEN:  Josh, do you have a problem with -- let

18  me get back to my number -- 205, Experian?

19       MR. FUCHS:  No objection.

20       MR. WOOTEN:  There's no objection to 205, Your Honor.

21       THE COURT:  It will be admitted.

22       (Plaintiffs' Exhibit 205 received in evidence.)

23  BY MR. WOOTEN:

24  Q.   Terry, can you identify this document, sir?

25  A.   Yes.  It's a March 29, 2011, Experian credit report for

1   me.

2   Q.   All right.  And I think page 4 has your PHH trade line.

3        MR. WOOTEN:  Chris.

4   BY MR. WOOTEN:

5   Q.   All right.  I know this is difficult to see.  Are you able

6   to see across the bottom line on the right where it has the

7   2011 time frame, you have the trade lines going:  Okay, okay,

8   or ND, ND?

9   A.   Yes.  I can see where it's:  Okay, okay, okay.  And then

10  it looks like February is 180, and then I can't make out the

11  March, showing 180 days late in February.

12  Q.   And is it your recollection that that -- that that credit

13  report indicated both of those months were 180 days delinquent?

14  A.   Yes.

15  Q.   All right.  And, again, this is during the time frame

16  where you're calling frequently to PHH asking for help, right?

17  A.   Yes.  This is March 29th, 2011, and it's also showing,

18  like, 60,000 past due as of March 2011.

19  Q.   All right.  And just to be clear, had you ever been

20  $60,000 past due on your mortgage payment?

21  A.   We had never been one month past due on our mortgage

22  payment.  We had made -- the reflection of:  Okay, okay, okay,

23  all the way through February of -- or January of 2010 is

24  accurate.  In fact, we had made our February payment on time.

25       MR. WOOTEN:  Josh, do you have 204?  That's the PHH

Judith A. Ammons, RPR, CRR, CCR
United States Court Reporter

1   payment in March.

2           MR. FUCHS:  204?

3       (Mr. Wooten/Mr. Fuchs confer.)

4           MR. WOOTEN:  Your Honor, we have -- our error, we had

5   apparently sent the wrong document to my co-counsel, and we

6   just realized that.  And he's looked at the letter and there's

7   no objection to 204.

8           MR. FUCHS:  No objection, Your Honor.

9           THE COURT:  What about 205?  Do you still want it in?

10          MR. WOOTEN:  Yes, sir.

11          THE COURT:  So 204 is admitted as is 205.

12      (Plaintiffs' Exhibit 204 received in evidence.)

13  BY MR. WOOTEN:

14  Q.   Terry, do you recognize 204?

15  A.   Yes.

16  Q.   And this is a document you received from your mortgage

17  company?

18  A.   Yes.

19  Q.   All right.  And tell the jury what you learned from this

20  letter.

21  A.   Well, it says that our check is being returned because

22  it's insufficient to clear the amount of the default, and that

23  we are $31,711.11 in arrears.

24  Q.   All right.  And this letter is dated what date?  March 29?

25  A.   March 29th of 2011.

1    Q.   All right.

2    A.   So we tried to make our March payment as it was due, and

3    they sent it back to us.

4    Q.   Terry, I'm going to show you 205, the trade line beside

5    this comment from the bank about your arrearage or your

6    delinquency.  Give us just a second to set that up.

7              MR. WOOTEN:  If you'll highlight the delinquency,

8    please, the 31,000 on the top box, and then the right column on

9    the bottom is 60,000.

10   BY MR. WOOTEN:

11   Q.   Terry, do you recall which of these documents you saw

12   first?

13   A.   The letter, or the --

14   Q.   The credit report?

15   A.   The credit report.

16   Q.   When you got the letter, did you compare it to what was on

17   the credit report?

18   A.   Yeah.  I mean, I looked at the letter and the credit

19   report and the other letter that said 57,000.  And, you know,

20   nothing -- just nothing jibed.  Everything was all

21   inconsistent.

22   Q.   And so some of those calls we just admitted by stipulation

23   to save us all a lot of time, you're calling to talk about

24   these things and asking for help from PHH, right?

25   A.   Yes.  I'm talking about those things.  The main thing that

1    I was calling them though is the 180 days late.  That's what

2    was keeping me from getting credit.  That's what was destroying

3    our income.

4          MR. FUCHS:  Objection, Your Honor.  That calls for

5    complete speculation.

6          THE COURT:  You can cross-examine on that.  That's

7    overruled.

8      Let's move on to something else.

9    BY MR. WOOTEN:

10   Q.   You mentioned a number of adverse effects you experienced

11   in this time frame.  Did you have an issue related to your own

12   health insurance?

13   A.   Yes, sir.  Health insurance, we couldn't afford to pay it

14   in May of 2011, so it lapsed.

15         MR. WOOTEN:  237, the letter, are you okay with that?

16   It shows the lapse.

17         MR. FUCHS:  I object to it.

18         MR. WOOTEN:  You object.  That's fine.

19      Your Honor, there's an objection to 247.  And what we'll

20   just do is we'll withdraw that document based on Mr. Toler's

21   testimony.

22         THE COURT:  Okay.

23   BY MR. WOOTEN:

24   Q.   You mentioned, Terry, that these issues affected your

25   ability to access credit.  And there was a foreclosure related

1   to your neighborhood, right?

2   A.   Yes.

3   Q.   And did you -- ultimately did foreclosure go to

4   completion?

5   A.   Yes.

6        MR. WOOTEN:  Josh, 251, are you okay with the

7   foreclosure judgment?

8        MR. FUCHS:  No objection.

9        MR. WOOTEN:  No objection to 251, Your Honor.

10       THE COURT:  It will be admitted.

11      (Plaintiffs' Exhibit 251 received in evidence.)

12  BY MR. WOOTEN:

13  Q.   If I could show you 251, please, sir.  Do you recognize

14  the document, sir?

15  A.   Yes.

16  Q.   Is this the judgment related to the foreclosure?

17  A.   Yes, it is.

18  Q.   All right.  Are you personally responsible for a portion

19  of the judgment in this case?

20  A.   I am.

21  Q.   Is it over a hundred thousand dollars?

22  A.   Yes.

23       MR. WOOTEN:  Josh, the deficiency, 295.

24       MR. FUCHS:  That's fine.

25       MR. WOOTEN:  Your Honor, there's no objection to 295.

1           THE COURT:  295 will be admitted.

2           MR. WOOTEN:  Thank you.

3       (Plaintiffs' Exhibit 295 received in evidence.)

4    BY MR. WOOTEN:

5    Q.   Do you recognize this document, Terry?

6    A.   Yes.

7    Q.   What is that document?

8    A.   This is the deficiency judgment from the bank against me

9    personally --

10   Q.   So this --

11   A.   -- and the business.

12   Q.   Right.  This judgment is indicating you personally have

13   responsibility as we just discussed, is that right?

14   A.   Yes.  When I wasn't able to make the payments, the

15   property was foreclosed on and then the bank got a deficiency

16   judgment against me.

17   Q.   All right.  Did there come a point you felt like you

18   needed to throw your hands up and walk away?

19   A.   Yeah.  I mean, in May of 2010, we thought they were

20   foreclosing on us and we were going to lose our house.  And the

21   property was being foreclosed on.  And I told Donna I didn't

22   know what to do.  I couldn't get PHH to change it.  And so we

23   went to Texas and got with a friend who is a lawyer down there

24   and he told us we should file bankruptcy.

25   Q.   Did you ever file bankruptcy?

Terry Toler - Direct

1    A.    No, we didn't.

2    Q.    These events going on, did they carry all the way through

3    the summer of 2011?

4    A.    They did.  After he suggested we file bankruptcy, Donna

5    really begged me to do it, to file bankruptcy, because she

6    couldn't stand what was going on, and so -- I'm sorry.

7    Q.    That's all right.

8    A.    We came back from Dallas, and I had a family meeting, I

9    called a family meeting.  My sons lived in Eagle Rock, too, all

10   three of them.  And I told them, I said, "J.B. has suggested

11   that we file bankruptcy, and there's nothing I can do."  And

12   the boys all worked for the business and it affected their

13   income.  And they had -- Stephen had a home in Eagle Rock.  And

14   one of my sons said, "Dad, you've always told us to never give

15   up.  That's what you've always told us."  He said, "I think we

16   should fight through it and we shouldn't quit."  And so I

17   agreed -- I agreed with them and I said, "Let's figure this

18   out.  Let's go back to work.  Let's figure out what we have to

19   do to get through this."

20         And I didn't know where I was going to get a loan.  We

21   were down to $500 basically in our -- Donna didn't know where

22   she was going to get money for even groceries.  We were

23   trusting God, and had a lot of faith in our boys, and we just

24   said, "We're going to work through this.  We're going to do it.

25   And we're not going to file bankruptcy," because if I file

1    bankruptcy, then, you know, it would be very hard to ever get

2    credit for what we needed from a bank from a line of credit

3    standpoint, and -- but we were really at the -- at the end

4    where if something didn't happen, then that was our only

5    alternative.

6          (Off the record.)

7    Q.    Terry, do you recall seeing your Experian credit report in

8    September of 2011?

9    A.    Yes.

10         (Mr. Wooten/Mr. Fuchs confer.)

11         MR. WOOTEN:   Judge, we have no objection to 301 by

12   Experian.

13         THE COURT:   It will be admitted, 301.

14         (Plaintiffs' Exhibit 301 received in evidence.)

15   BY MR. WOOTEN:

16   Q.    Terry, let me clarify.  It was brought to my attention you

17   said May of 2010 when you were worrying about the foreclosure

18   issue, but that was actually May of 2011, is that correct?

19   A.    Yes.  If I said '10, I misspoke.  It's 2011.

20   Q.    I think I understood, but I didn't catch that.  I'm sorry.

21         Do you recognize this document marked 301?

22   A.    Yes.  That's my Experian credit report on September 19th

23   of 2011.

24   Q.    And with respect to that document, does it contain

25   information related to your PHH trade line?

1    A.   Yes.  It's not on the screen, but I'm sure it does.

2    Q.   We're going to pull it up.  Page 4, I guess.  I apologize,

3    Terry.  I thought I had the page number marked on that.  Let's

4    look at 6.

5         MR. WOOTEN:  Try 6, Chris.

6         Do you recall -- let's take that down because I can't

7    remember my page number.  I apologize.

8    BY MR. WOOTEN:

9    Q.   Terry, do you recall if there was information in that

10   credit report you were concerned about?

11   A.   Yes.

12   Q.   It was still inaccurate?

13   A.   Yes, it's still inaccurate.

14   Q.   And to be perfectly fair, you still had not gone to

15   Experian at this point and said, "Hey, there's a problem with

16   this"?

17   A.   Correct.

18   Q.   All right.  At this point were you still receiving

19   assurances from PHH that they were going to get it straight for

20   you?

21   A.   Yes.

22   Q.   Do you remember when you finally went to the credit

23   bureaus in 2011?

24   A.   Yes.  It was November 1st or 2nd or 3rd of 2011 when we

25   disputed the 180 days late.

1          (Mr. Wooten/Mr. Fuchs confer.)

2     BY MR. WOOTEN:

3     Q.   Let me show you a document we marked as Exhibit 324,

4     please.

5               MR. WOOTEN:  Page 6, Chris.

6               THE COURT:  Is there any objection to that?

7               MR. WOOTEN:  There's no objection.  I apologize, Your

8     Honor.

9               THE COURT:  It will be admitted.

10         (Plaintiffs' Exhibit 324 received in evidence.)

11    BY MR. WOOTEN:

12    Q.   When you disputed, did you dispute for both you and your

13    wife?

14    A.   Yes.

15    Q.   Do you recognize Exhibit 324?

16    A.   Yes.

17    Q.   All right.  Can you tell us what that is?

18    A.   This is the Experian credit report for Donna --

19    Q.   All right.

20    A.   -- on November 2nd, 2011.

21    Q.   All right.  Is this a report that triggered your dispute?

22    A.   Yes.

23    Q.   And does it have the same type of derogatory information

24    related to past due balances that you've been experiencing

25    through the previous year?

1   A.   Yes.  It says 51,624 past due as of October 2011, and then

2   it's got a monthly payment of 2,868.

3   Q.   We heard on the earlier phone call that PHH said they had

4   recorded your loan modification back in December of '10, right?

5   A.   Correct.

6   Q.   Let me show you 327.  I also believe there's actually --

7   let's skip 327.  I think it's a duplicate.  Look at 328.

8           MR. WOOTEN:  Josh, did you get that?  You already said

9   they were okay?

10          MR. FUCHS:  Yeah, I did.

11          MR. WOOTEN:  Your Honor, we're going to offer 328.

12  There's no objection to this document.

13          THE COURT:  It will be admitted.

14      (Plaintiffs' Exhibit 328 received in evidence.)

15          MR. WOOTEN:  This is page 6, Chris.

16      All right.  Your Honor, I'm going to put this document on

17  the other device.  We've got a -- we got it.  Sorry.  We

18  thought the technology was going out on us again.

19  BY MR. WOOTEN:

20  Q.   Do you recognize 328 as another Experian report?

21  A.   Yes.

22  Q.   And this one is dated the day after the previous one we

23  just saw?

24  A.   Right.

25  Q.   And nothing has changed about the data on that day,

1    correct?

2    A.   No.

3    Q.   All right.

4    A.   And this is Donna's report.

5    Q.   Right.

6         (Mr. Wooten/Mr. Fuchs confer.)

7         MR. WOOTEN:  Don't publish that just yet.  I'm going

8    to tell you what page number.  Page 5.

9         Your Honor, we have a stipulation also as to Exhibit 330.

10   We're going to only offer page 5 of that exhibit and cover the

11   rest of it by testimony.

12        THE COURT:  Is that your agreement?

13        MR. FUCHS:  Yes, Your Honor.

14        THE COURT:  It will be admitted.  Page 5 of Exhibit

15   330 will be admitted.

16        (Plaintiffs' Exhibit 330, page 5, received in evidence.)

17   BY MR. WOOTEN:

18   Q.   So, Terry, just to be clear, we looked at the

19   November 3rd credit reports.  Did you dispute to all of the

20   credit bureaus that day?

21   A.   Yes.

22   Q.   All right.  And is this the letter that you sent to

23   Experian?

24   A.   Yes.

25   Q.   All right.  And in this letter, what did you tell them?

Judith A. Ammons, RPR, CRR, CCR
United States Court Reporter

1    A.   I told them that they were reporting inaccurate credit

2    information, that PHH has been reporting that we were 180 days

3    late on payments as of February of 2011.  I told them that

4    wasn't accurate, that we were current on all of our payments

5    all the way through March of 2011.  Of course, the March

6    of 2011 was returned, but we had tried to make that payment.

7    Q.   And is that when the dispute with PHH began about whether

8    they would accept your payments or not and you started getting

9    the contrary information?

10   A.   Yes.

11   Q.   So there are calls in those tapes the jury can listen to

12   where people say to you, "Make a payment," right?

13   A.   There's one call from one lady that says that we could

14   start making our payments.  I think that's, like, in May

15   of 2011.

16   Q.   And there are also calls where you get contrary

17   instructions, right?

18   A.   Correct.

19   Q.   So did you get a response to this dispute?

20   A.   Yes.

21        MR. WOOTEN:  340, Josh, is the response.

22        MR. FUCHS:  That's fine.

23        MR. WOOTEN:  Judge, we have no objection to 340.

24        THE COURT:  I know you have no objection, but the

25   other side --

1          MR. WOOTEN:  I'm sorry.  There's no objection -- I

2     apologize for my phrasing, Your Honor.

3          MR. FUCHS:  Your Honor, he is speaking for me and

4     that's absolutely fine, on occasion.

5          THE COURT:  340 is admitted.

6     (Plaintiffs' Exhibit 340 received in evidence.)

7     BY MR. WOOTEN:

8     Q.   Did you get a response back from Experian in this

9     instance?

10    A.   Yes.

11    Q.   And have we accurately reflected what the response was?

12    A.   Yeah.  They are saying that they investigated this back --

13    I'm guessing, back -- or looks to me like to that August 2010

14    dispute, and so they are not even going to conduct an

15    investigation on this one.

16    Q.   So to be clear, you haven't had an Experian dispute

17    between August of '10 and November of '11?

18    A.   Yes.  And I didn't -- yes, that's correct.

19    Q.   Okay.  That's fine.  And this is not clear that it's

20    relating back to that, correct?

21    A.   Correct.

22    Q.   All right.

23    A.   It doesn't state the date of the August 2010.

24    Q.   But that was consistent with your records about your last

25    previous dispute?

1    A.   Yes.

2            MR. WOOTEN:  And, Your Honor, you already admitted

3    that, correct?

4            THE COURT:  340, yes.

5            MR. WOOTEN:  Yes.

6            THE COURT:  I admitted it because you had no

7    objection.

8            MR. WOOTEN:  Thank you, Your Honor.

9    BY MR. WOOTEN:

10   Q.   Now, you had a dispute at the same time for Donna on the

11   same account, right?

12   A.   Yes.

13   Q.   Did you get the same type of response for Donna?

14   A.   I believe it was different, but it was ultimately the

15   same, they weren't going to fix it.  But, yes, we got a

16   response.

17           MR. WOOTEN:  347.

18           MR. FUCHS:  That's fine.  No objection.

19           MR. WOOTEN:  Your Honor, I'm told the defendant has no

20   objection to 347.

21           THE COURT:  347 will be admitted.

22           MR. WOOTEN:  Thank you, Your Honor.

23       (Plaintiffs' Exhibit 347 received in evidence.)

24   BY MR. WOOTEN:

25   Q.   Do you recognize 347?

Judith A. Ammons, RPR, CRR, CCR
United States Court Reporter

1    A.    I do.

2    Q.    Does it indicate the resolution of Donna's dispute?

3    A.    Well, it indicates there's no resolution.  It's just going

4    to stay on there just like it is.

5    Q.    All right.  And that's what you understood from that,

6    correct?

7    A.    Yes.

8    Q.    Now, with respect to the Equifax and TransUnion, we heard

9    a stipulation earlier that PHH simply did not respond to

10   Equifax and TransUnion, so this trade line got deleted because

11   of that failure to respond, right?

12   A.    Yes.  Equifax and TransUnion removed the PHH just

13   altogether.  They didn't fix it or change any numbers.  They

14   just deleted it altogether.

15   Q.    And that was because PHH just simply did not respond to

16   those two credit reporting agencies?

17   A.    Correct.

18   Q.    All right.  And can you tell the jury how the deletions

19   with respect to Equifax and TransUnion -- how that impacted

20   your family?

21           MR. FUCHS:  Objection.  That calls for speculation,

22   Your Honor.

23           THE COURT:  I'm going to let him speculate.  He's the

24   plaintiff.  I think he can testify to that.  This goes to

25   mental anguish, too.

1        But go ahead, sir.

2        It's overruled.

3            THE WITNESS:  Well, it was a Godsend for me, because

4     at least two reports didn't have the trade line on there.  And

5     so that meant that if I applied for credit with a bank or a

6     line of credit or something that pulled Equifax or TransUnion,

7     then I could get credit.  And if they pulled Experian, then I

8     wouldn't be able to get credit.  But if I made enough of these

9     credit applications, because I don't know which one the banks

10    or whoever is going to pull, then at least I could start

11    rebuilding our business and rebuilding our lives.  And it was

12    really kind of, you know, an answer to prayer for us.

13    BY MR. WOOTEN:

14    Q.   So you were at least able to access credit in certain

15    instances after that, is that correct?

16    A.   Yes.

17    Q.   All right.  But you were still having problems related to

18    these issues you had experienced, correct?

19    A.   Yes.

20        (Mr. Wooten/Mr. Fuchs confer.)

21            MR. WOOTEN:  The defendant has no objection to

22    Exhibit 354, Your Honor.  We would offer that.

23            THE COURT:  It will be admitted.

24        (Plaintiffs' Exhibit 354 received in evidence.)

25    BY MR. WOOTEN:

1    Q.    Terry, do you recognize this document?

2    A.    Yes.

3    Q.    And can you tell the jury what it is?

4    A.    It's a lawsuit from Updoc, Inc. against me personally.

5    Q.    All right.  And this was related to some money owed

6    through your All Pro Classics business?

7    A.    Yes.

8    Q.    All right.  And when was that filed, if you can tell

9    there?

10   A.    Looks like it's 12/28 of '11.

11   Q.    All right.  How was your overall income impacted in 2011

12   because of these issues?

13   A.    Well, my tax return, I showed a $664,000 loss for 2011.

14   Q.    All right.

15   A.    And that was -- both of the companies had a loss, but that

16   was primarily because we lost the real estate property, and so

17   we lost all the basis in that.  It was gone.  We didn't have

18   any -- any -- any asset there any more, and that created a

19   $664,000 loss on my tax return.

20   Q.    Terry, did you experience some credit denials related to

21   these issues?

22   A.    I did.

23         (Mr. Wooten/Mr. Hargis confer.)

24         MR. WOOTEN:  Your Honor, I apologize for the

25   indulgence, but we do have another document we need to address

1    the Court just momentarily.

2            THE COURT:  I'll meet you at bar side.

3        You may stand, stretch, reach, yawn, talk softly, but you

4    can't leave.

5            (Bench conference reported as follows:)

6            MR. WOOTEN:  Your Honor, we had an exhibit that we had

7    marked as 360 parts A through F which were individual credit

8    denial letters.  These are addressed to Mr. Toler at his home

9    address related to various credit card accounts where he

10   applied for credit and was denied.  These range through the

11   time frame where we're here about related to the dispute.  And

12   I think they have lodged a hearsay objection similar to what

13   they had earlier.

14           THE COURT:  And I may be wrong, but I'm going to be

15   consistent.  You can ask him if he's been denied certain loans.

16   I think you've done that.

17           MR. WOOTEN:  I just wanted to be clear we had a record

18   on that issue.  I don't want to take any more time --

19           THE COURT:  I'll tell you also 360 is tendered and

20   refused.  And give it to Sallie.

21       How much longer are you going to be?

22           MR. WOOTEN:  We're in sort of the damages discussion

23   about this, summarizing that, and I should be able to tender

24   the witness.

25       I do want to take a moment to inoculate him a little bit

1    about those other lawsuits and make sure the jury understands

2    he's not an angel, and there are other things.  Hopefully, if

3    we go smoothly, 20 minutes.

4            MR. FUCHS:  Your Honor, I had a little bit of a

5    reconsideration about this.

6        If you're going to ask him whether he has credit denials

7    and he thinks they are attributable to Experian, I'm going to

8    use these to impeach because that shows they are the --

9            THE COURT:  You're objecting, and then going to use

10   them?

11           MR. FUCHS:  Yes.  I don't want --

12           THE COURT:  Have you reconsidered?

13           MR. FUCHS:  I'm reconsidering if he asks the right

14   questions.

15           MR. WOOTEN:  We could offer them for what they say and

16   the jury give them whatever weight they deem appropriate.

17           THE COURT:  I'm going to change my ruling and I'll say

18   360 is admitted.  And you can cross-examine.

19       (Proceedings continuing in open court as follows:)

20           THE COURT:  Exhibit 360 will be admitted.

21       (Plaintiffs' Exhibit 360 received in evidence.)

22           MR. WOOTEN:  Based on our discussion, Your Honor,

23   plaintiffs would like to offer 360.

24           THE COURT:  I just admitted it.

25           MR. WOOTEN:  And there are subparts to that, A through

Judith A. Ammons, RPR, CRR, CCR
United States Court Reporter

1    F.

2           THE COURT:  And the subparts are admitted also.

3    BY MR. WOOTEN:

4    Q.   Terry, I'm going to ask you to take a look at the document

5    we marked as Exhibit 360A.  Do you recognize that document?

6    A.   Yes.

7    Q.   And did you make an application for credit with Capital

8    One?

9    A.   Yes.

10   Q.   And were you denied?

11   A.   Yes.

12   Q.   All right.  Does the letter of denial indicate to you

13   whose credit report was pulled?

14   A.   Yes.  It says Experian was pulled and Equifax.

15          MR. WOOTEN:  All right.  Show the next page, please,

16   sir.

17   BY MR. WOOTEN:

18   Q.   306A2, key factors, is this the second page of that

19   letter?

20   A.   Yes.

21   Q.   All right.  And does it indicate -- give you some reasons

22   there about your denial?

23   A.   Yes.  It says "serious delinquency."

24   Q.   Were you aware of any serious delinquency on your credit

25   reports other than the mortgage trade line with PHH?

1    A.   Not that had ever kept me from getting credit.

2         MR. WOOTEN:  All right.  All right.  Let's show 360B,

3    please.

4    BY MR. WOOTEN:

5    Q.   You see information about FICO and below that indented

6    paragraph, right below that where it says -- 360B, is that also

7    another credit denial letter?

8    A.   Yes.

9    Q.   Who is that from?

10   A.   American Express.  I believe it's covered up now, but I

11   believe I saw "American Express" before.

12   Q.   All right.  And in August of 2013 were you aware of any

13   serious delinquency other than the PHH trade line?

14   A.   Not that kept me from getting -- getting credit.

15        MR. WOOTEN:  All right.  360C, please.

16   BY MR. WOOTEN:

17   Q.   Do you recognize this as another credit denial letter?

18   A.   Yes.

19   Q.   Does this indicate -- who is this potential credit

20   grantor?

21   A.   It was Wells Fargo.

22   Q.   All right.  And does it also indicate that Experian was

23   one of the credit bureaus pulled?

24   A.   Yes.

25   Q.   All right.  Also pulled Equifax there, right?

1    A.    Right.

2          MR. WOOTEN:   Let's look at 360D, please, middle

3    paragraph, Chris.

4    BY MR. WOOTEN:

5    Q.    Is this another credit denial letter?

6    A.    Yes.

7    Q.    Does it also indicate an Experian credit report was used?

8    A.    Yes.

9          MR. WOOTEN:   Can we go to page 3 of that, Chris, that

10   paragraph that indicates credit score disclosure, please?

11   BY MR. WOOTEN:

12   Q.    This indicates -- did you have a credit score of 695 at

13   the top second line?

14   A.    Yes.

15   Q.    And down at the bottom where it says "The factors that

16   affect your credit score," there are a number of factors

17   listed, but one is "serious delinquency," correct?

18   A.    Correct.

19   Q.    Are you aware of any other delinquencies shown on your

20   Experian credit report in January 2014 other than the PHH trade

21   line?

22   A.    There may have been, but they wouldn't have kept me from

23   getting credit.

24   Q.    Were there a number of other accounts that could be

25   considered negative that appeared on all three of your credit

1    reports?

2    A.   Yeah.  We lost all of our credit cards in 2011.  They were

3    all canceled.  So we had to resolve those issues with those.

4    Since we weren't going to file for bankruptcy, we began to work

5    with them to get those paid off.  And so we did that in 2012,

6    but they still went on our report as -- you know, as a

7    negative.  But I was still able to get credit with Equifax and

8    TransUnion whenever I wanted, just not with Experian.

9    Q.   Was there any accounts you considered to be a major

10   negative on your credit report other than the PHH account that

11   did not appear on all three credit reports?

12   A.   No.

13   Q.   All right.  Let's look at E, please.  Is this an

14   additional credit denial?

15   A.   Yes.

16   Q.   And does this document also indicate that there was an

17   Experian credit report pulled?

18   A.   Yes, I see it there.

19        MR. WOOTEN:  And, Chris, if you'll go to the third

20   page, the top information there -- or the second page, I'm

21   sorry, of that document, top right there.

22   BY MR. WOOTEN:

23   Q.   Is this the second page of the turndown letter?

24   A.   Yes.

25   Q.   Again they cite to a number of reasons.  The serious

1    delinquency reason we have highlighted, correct?

2    A.    Yes.  And it also says "too many inquiries," which was

3    really affecting my credit score as well because I was having

4    to apply to a bunch of different places, not knowing whether

5    they were Experian or Equifax or TransUnion.  And so I had a

6    lot of inquiries on there and that was hurting my ability to --

7    I mean, it was bringing down my score as well.

8    Q.    And in the normal course of things, you applied for credit

9    a lot anyway, right?

10   A.    Yes, but not nearly like what we were doing during that

11   time.

12   Q.    So you were just kind of playing hit or miss during this

13   time frame?

14   A.    We were.  But in 2011, we had our credit cards

15   established, so we really didn't make credit card applications.

16   And we had our mortgage established, and we had our cars

17   established, so we didn't really do a lot of credit inquiries

18   for those types of things.  But once we lost all of our credit

19   cards, then I had to start -- in 2012 start rebuilding our

20   credit.

21   Q.    Let me show you the last one of those is 360F.  And,

22   again, is that also another denial letter?

23   A.    Yes, that's on Donna's.

24   Q.    All right.  And does it also indicate an Experian report

25   was pulled?

1   A.   Yes.

2   Q.   And was Donna's credit report, to your knowledge, in the

3   same shape as yours in the sense that it also had the -- it had

4   the PHH trade line as a major negative, but the other

5   potentially derogatory accounts were across all three?

6   A.   Right.  There was some -- some variation from the

7   standpoint that Equifax had also removed the Amex account and

8   Citicorp that we had disputed.  And Experian had left those two

9   on the report as well, so Experian was reporting a couple of

10  negative trade lines that we had disputed that Equifax took

11  off.  And I'm not sure what TransUnion did with them, but

12  Equifax took those two off.

13  Q.   Is it fair to say that since 2011, would your credit

14  reports be in the situation that the PHH trade line is only on

15  Experian, that you have been able to consistently get credit as

16  long as an Experian credit report is not pulled?

17  A.   Correct.  I think it's 100 percent.

18  Q.   And is it also consistent to say that -- is it also

19  consistent to say that when an Experian report is pulled, you

20  almost universally get denied?

21  A.   I think we got approved for one account, which was a

22  500-dollar credit card with a 150, 175-dollar annual fee and a

23  high interest rate.  I think that's the only one we actually

24  got from Experian from 2011 through today.  And we have since

25  canceled those, that -- because it's so high interest, now that

1    we've been able to get other credit cards.

2    Q.   Eventually did you decide that you had to go to court to

3    try to get this straight?

4    A.   Yes.

5    Q.   Do you remember when you filed your lawsuit?

6    A.   January of 2012.

7    Q.   And in January of 2012, your PHH trade line was still

8    showing with a 180-day negative, right?

9    A.   Yes.

10   Q.   All right.  And you were still -- at that point still

11   trying to work with them directly to resolve that dispute,

12   right?

13   A.   Yes.

14   Q.   And when we filed -- or when this case was filed, they

15   were actually a defendant in the case as well, right?

16   A.   Yes.

17   Q.   All right.  Do you remember seeing a credit report from

18   Experian in the early part of 2012?

19   A.   If -- yes, I do.

20        MR. WOOTEN:  All right.  Let me doublecheck with my

21   colleagues.

22        (Mr. Wooten/Mr. Fuchs confer.)

23        MR. WOOTEN:  Your Honor, we would propose to offer

24   377.  I'm told the defendant has no objection to that.

25        THE COURT:  It will be admitted, 377.

Terry Toler - Direct

1   BY MR. WOOTEN:

2   Q.   Do you recognize this document, Terry?

3        MR. FUCHS:  Your Honor, I'm sorry.  There was a little

4   bit of confusion when we were looking.  This document has some

5   of the objections that we raised earlier in the case about

6   timing.  And we'd either like to approach just so we can make a

7   record or have a dialogue about it.

8        THE COURT:  I'll see you at bar side.

9        Stand, reach, stretch, yawn, discuss softly.  Don't talk

10  about the case.

11       (Bench conference reported as follows:)

12       THE COURT:  What's your --

13       MR. FUCHS:  This entire line of testimony, including

14  this document and the previous testimony, is all about

15  2014, 2013, activity after the lawsuit, which we have a motion

16  in limine on that that it shouldn't -- just shouldn't be

17  allowed under the law when we're in a collateral dispute like

18  this.  And we want to continue to raise that and have it noted.

19  I think you might have said we had a running objection on that.

20  But that's our objection.

21       THE COURT:  That's called continuing, but I think in

22  the Eighth Circuit you probably are smart to renew it.  I'm

23  going to admit it over your objection.

24       MR. FUCHS:  The objection?

25       THE COURT:  How long do you think you're going to be

Judith A. Ammons, RPR, CRR, CCR
United States Court Reporter

Terry Toler - Direct

1    with this?

2           MR. WOOTEN:  This is merely sort of moving through

3    this just to get the timeline down, so this won't take just a

4    minute or two in this.

5           THE COURT:  How much longer is it going to be after

6    this?

7           MR. WOOTEN:  I'm really trying to finish, Judge.  I

8    know I've gone more than I thought I would.  So 10, 15 minutes.

9    I'm trying to get done.  I keep trying to cut things out.  I

10   have a ton of exhibits.

11          THE COURT:  I understand.  I want you to try your

12   lawsuit.

13          MR. WOOTEN:  I don't want to go over --

14          THE COURT:  I'm concerned, too, Mr. Fuchs is going to

15   be permitted to cross-examine.  I don't want him to think he's

16   got --

17          MR. WOOTEN:  And the issue is that, you know, this is

18   probably the longest witness in the case in my mind by far

19   because, I mean, they have a lot of things they want to ask

20   him.

21          THE COURT:  Well, does Mrs. Toler know anything about

22   the business?

23          MR. WOOTEN:  No.  She's going to be very brief, I'm

24   thinking 30 minutes for me, and they can take whatever shots

25   they want.  That's my plan.

1          THE COURT:  I think your cross-examination may be

2     lengthy of Mr. Toler.

3          MR. FUCHS:  Probably shorter than what he's done, but

4     it's going to be an hour plus.

5          MR. WOOTEN:  Probably 90 percent of our exhibits in

6     this case are coming in through Mr. Toler, and once he's done,

7     we'll be like a rocket.

8          THE COURT:  I'm not fussing.

9          MR. WOOTEN:  We're planning on, like, six witnesses

10    tomorrow.  I've already given them documents and names and

11    everything.

12         THE COURT:  Do you have any objections?

13         MR. FUCHS:  It is hearsay.  I know it says Experian,

14    but it's not actually an Experian document.  It's a Tri-Merge

15    report they submitted years ago.

16         THE COURT:  A forgery?

17         MR. FUCHS:  No, a different company.  We don't create

18    it or maintain it.  We didn't actually produce it.  It's out of

19    his files.

20         THE COURT:  You can ask that on cross-examination if

21    we ever get there.

22         MR. WOOTEN:  I'm sorry, Judge.

23       (Proceedings continuing in open court as follows:)

24         THE COURT:  What's the number of that?  377?  It's

25    received per the ruling at bar side.

1          (Plaintiffs' Exhibit 377 received in evidence.)

2    BY MR. WOOTEN:

3    Q.   Terry, I'm going to try to shorten this and move quickly

4    through these exhibits.  And I apologize for taking so long.

5    So to try to do that, did you also get a credit report just

6    like this for you at the same time?

7    A.   Yes.

8          MR. WOOTEN:  We won't even offer that one, Judge.

9    BY MR. WOOTEN:

10   Q.   And you compared the two and they had the same information

11   about the PHH trade line?

12   A.   Yes.

13   Q.   All right.  This is -- all right.  Is this the trade line

14   information that was relative to the PHH trade line in this

15   case?

16   A.   Yes.

17   Q.   And this is around the time that the lawsuit began,

18   correct?

19   A.   Yeah, it's right after.

20   Q.   And is this still showing derogatory information relating

21   to this account?

22   A.   Yes.  It's showing past due 180 days.

23   Q.   All right.  Do you ever recall a point in any of those

24   calls that we admitted by stipulation where anybody said to you

25   you were actually 180 days late?

1    A.   No, just the opposite, they said we weren't late.  They

2    pulled up our payment history and could see where we made every

3    payment.  And they said over and over again, "We see where you

4    made your payment.  There's just some problem."

5    Q.   Did they blame it on some weird department -- closing

6    department or something?

7    A.   Yes, they blamed it on the closing department, and the

8    closing team needed to close the loan and issue a credit

9    retraction.

10   Q.   And then they said life would return to normal at PHH,

11   right?

12   A.   I'm sorry?

13   Q.   After that occurred, life would supposedly return to

14   normal with PHH?

15   A.   Right.

16   Q.   Let me try to help us move along.  Is it fair to say that

17   this type of derogatory data about your PHH trade line has

18   existed on each of your Experian reports all the way through

19   today?

20   A.   Yes.  I pulled it on Saturday, and it's still showing 180

21   days late, still showing derogatory on Experian.

22   Q.   All right.  Do you recall there being another dispute

23   after the lawsuit was filed in this case regarding the PHH

24   trade line?

25   A.   Yes.

1    Q.   And who initiated that dispute?

2    A.   I did.

3    Q.   Did anyone else initiate a dispute on your behalf after

4    the lawsuit was filed?

5    A.   No.

6    Q.   Do you recall whether Experian initiated a dispute of

7    their own?

8    A.   Yes.  Right.  Yes.  Experian did initiate a dispute on

9    April the 7th of 2012.

10   Q.   All right.  Terry, with respect to your frustrations with

11   Experian, why do you blame them for this issue instead of

12   blaming PHH?

13   A.   Well, I wouldn't say that I blame them instead of blaming

14   PHH, because I certainly -- PHH has a lot of blame in this

15   situation.  But Experian is the gatekeeper.  They are the ones

16   that go out and gather our information and put it on a credit

17   report.  I don't ask them to do that.  They go do that

18   themselves and sell it to third parties.

19        And I blame them for what is logical -- you can't go:

20   Current, current, current, 180 days late.  And if they did any

21   type of investigation at all, they would see that that was

22   obviously an error.  And to just say, "We've investigated it

23   and it's verified and it's the same," just -- it doesn't make

24   any sense in terms of their responsibility to protect our

25   credit.  I mean, it was ruining our lives.  And after we filed

1    the lawsuit, they could see how much it was ruining our lives,

2    and yet they still wouldn't do anything about it.

3        And probably the thing that makes me the angriest about

4    Experian is I begged them to just suppress it, just take it off

5    the report until the lawsuit is over, and if we lose the

6    lawsuit, then put it back on all you want, but if we win the

7    lawsuit, at least Donna and I don't have to spend three and a

8    half years dealing with this every single day of our lives.

9    And when Experian lawyers said, "Well, we'll suppress it if

10   you'll drop us from the lawsuit" --

11            MR. FUCHS:  Objection, Your Honor.

12            THE COURT:  If there's an objection, that's sustained.

13   I don't want to get the attorneys involved.

14       Let's move on to something else, please.

15   BY MR. WOOTEN:

16   Q.   Terry, since this -- let me be clear.  Since November

17   of 2011 and going forward, what type of problems have you had

18   related to these issues?

19   A.   Well, they've just been monumental.  We've had lawsuits,

20   you know, since February of 2011 that I've had to deal with.

21   We've had this lawsuit that we have had to deal with.  It's --

22   we've dealt with, you know, the embarrassment of all of this

23   because people think that Donna and I are deadbeats, you know,

24   that we don't pay our bills, and that we're -- our property was

25   foreclosed on because we didn't pay our bills.  And creditors

1    for All Pro Classics think that, you know -- that I'm a

2    deadbeat because I didn't -- I didn't -- we didn't pay the

3    bills on time, which we would have had we just been left alone

4    and able to live our lives the way that we wanted to.

5         Our boys had to move back to Dallas and go back there

6    because they couldn't earn an income.  So my boys were here

7    working with us every day and I'd get to see them every day.

8    And now we still work together, but, you know, it really

9    affected them significantly as well.

10   Q.   Let me ask you this.  Is it -- have you had any physical

11   manifestations of these issues that you blame on these events?

12   A.   Well, I felt like that I've lived in kind of a heightened

13   state sense of urgency since all of this happened because I had

14   to figure out how to resolve it.  Probably the biggest thing

15   for me is sleeplessness.  I get up at 2:00 or 3 o'clock every

16   morning now -- I can't sleep through the night -- and, you

17   know, just start working on trying to figure out what to do and

18   how to do it and putting together plans and those types of

19   things.  But it's just been -- it's just been a constant stress

20   of trying to figure out what to do.

21        And I felt like I've let Donna down because I couldn't

22   figure out how to fix this for her.  And she's had to suffer so

23   much because of it.  And I didn't know what to do.  I

24   couldn't -- I couldn't figure out how to get PHH to -- so

25   obvious, just fix it.  It was so obvious to Experian, just take

1    it off the report.  And I couldn't understand -- and it was so

2    frustrating, I couldn't understand why they wouldn't just fix

3    it.  And why did it have to -- why did it have to go three and

4    a half years?  And I don't -- I don't think Donna and I deserve

5    to have to go through this for three and a half years when it

6    could have been fixed so easily.

7    Q.   Do you have any guarantee it's going to be fixed when we

8    walk out of here at the end of the trial?

9    A.   I don't think --

10        THE COURT:  If there's an objection, that will be

11   sustained.

12        MR. FUCHS:  Objection, Your Honor.

13        THE COURT:  It's still sustained.  Talk me out of it.

14   Anything further?

15        MR. WOOTEN:  Your Honor, I just need to check a couple

16   of points.

17   BY MR. WOOTEN:

18   Q.   Let me just be clear because I don't want to mislead

19   anybody in this courtroom.  You're not a perfect person, are

20   you, Terry?

21   A.   No, I'm not.

22   Q.   You've got some lawsuits that predate all of this, don't

23   you?

24   A.   Yes.

25   Q.   And you've got some credit problems that predate all of

1    this, don't you?

2    A.   Yes.

3    Q.   All right.  And so whatever questions you get asked about

4    that, we'll let those go with Mr. Fuchs.

5           MR. WOOTEN:  Let me check one more thing, Your Honor,

6    and I think I can tender the witness.

7    BY MR. WOOTEN:

8    Q.   One other thing, Terry, I think I have to ask you that's

9    relevant.  Did you have a dispute with Experian about your

10   credit report related to one of the credit card accounts you

11   had?

12   A.   Two of them, actually, American Express and Citicorp, yes.

13   Q.   Are they some of the accounts that were involved in some

14   of this litigation?

15   A.   In this litigation, or involved in litigation?

16          MR. WOOTEN:  That was a very poor question, Your

17   Honor.  I'll withdraw it.

18   BY MR. WOOTEN:

19   Q.   Were you sued over those credit cards?

20   A.   Yes.

21   Q.   All right.  Not in this case; in another case?

22   A.   Yes.

23   Q.   And did those cases get dismissed with prejudice?

24   A.   They did with us owing nothing.  We --

25   Q.   And did you dispute those trade lines?

1    A.    Yes.

2    Q.    And were they removed?

3    A.    They were removed on Equifax, but they weren't removed on

4    Experian.

5    Q.    So they remain on Experian?

6    A.    Yes.

7    Q.    And that occurred while this litigation was going on?

8    A.    Yes.

9              MR. WOOTEN:  All right.  I'll tender the witness, Your

10   Honor.

11             THE COURT:  May I see the attorneys at bar side just

12   briefly?

13        You may stand, stretch, reach, so on.

14        (Bench conference reported as follows:)

15             MR. WOOTEN:  Your Honor, I'm sorry.  That's taken a

16   lot longer than I hoped it would.

17             THE COURT:  I want to be completely fair with

18   Mr. Fuchs.  Do you want to start in the morning?

19             MR. FUCHS:  That's fine, Your Honor.

20             THE COURT:  No.  I mean, that needs to be your idea if

21   we're going to do it because --

22             MR. WOOTEN:  I know I wouldn't want to split mine up

23   either.  That's the problem.

24             THE COURT:  I understand it may give him time to be

25   organized and let everybody get more rested.

1      MR. FUCHS:  That's fine.  That's a good idea, Your

2   Honor.

3      MR. WOOTEN:  Do you want to start earlier?  Are we

4   able to start earlier to save a few minutes?  Are we able to

5   start at 8:30?

6      MR. FUCHS:  I'll tell you what, Your Honor.  Why don't

7   I go for 30 minutes or so, get started, that way we're saving

8   as much of the jury's time as possible towards the end of the

9   week?  I can go 30 or 45, 30 minutes.

10      THE COURT:  You think at 4:30 we can stop?

11      MR. FUCHS:  Yes.

12      THE COURT:  The furthest juror, I just checked, is

13   probably about 20 miles.

14      MR. WOOTEN:  We can start as early as you're willing

15   to start, Your Honor.

16      THE COURT:  The weather --

17      MR. WOOTEN:  Seems to be better.

18      THE COURT:  Why don't we go ahead and at least start

19   and go to 4:30 and we'll stop?  Would you kind of remember when

20   we stop, so I don't repeat --

21      MR. FUCHS:  I'm not going to retread ground.

22      MR. WOOTEN:  Thank you, Your Honor.

23      (Proceedings continuing in open court as follows:)

24      THE COURT:  Ladies and gentlemen of the jury, we're

25   going to start cross-examination, but we're probably going to

1   stop about 4:30.  That means we'll start again in the morning.

2   because I'm sure Mr. Fuchs will not be through by then.  But it

3   may be a good stopping point for us about 4:30, and then we'll

4   come back in the morning.

5       I think we can come back -- is 9 o'clock still okay?  Is

6   that too early, too late, or whatever?

7       (Off the record.)

8           MS. PERRY:  Your Honor, may we give the witness a

9   binder?

10          THE COURT:  Yes.

11      Does anyone need a break before we start for 30 more

12  minutes?  Are you okay?

13      I didn't ask my clerk.

14          THE COURTROOM DEPUTY:  I'm good, Judge.

15          THE COURT:  In the old days, we had a pitcher of water

16  and a series of cups.  Now we've --

17          THE WITNESS:  I've got a pitcher.

18          THE COURT:  We tried a case in Fort Smith one time.

19  My staff wouldn't want me to tell you this.  It lasted a week,

20  and we had many, many witnesses testify.  And it was hot, and

21  everybody drank water out of the pitcher.  At the end of the

22  week, we realized we had only used one cup.  And I think the

23  statute of limitations has run and we're not going to get sued

24  over that now.

25          Cross-examine, please.

Terry Toler - Cross

1                    CROSS-EXAMINATION

2    BY MR. FUCHS:

3    Q.   Good afternoon, Mr. Toler.  I want to be clear about one

4    thing.  You started off and you said that your issues with PHH

5    have been resolved.  How long ago did that take place?

6    A.   It was last Thursday, I believe.

7    Q.   About 12 days ago?

8    A.   Yes.

9    Q.   And that's not finally resolved, is it?

10   A.   The agreements aren't signed, but it's resolved.

11   Q.   And you understand I've been instructed by both PHH's

12   counsel and your counsel not to touch the report at this point

13   in time, correct?

14   A.   I don't know what they've -- what PHH's counsel or my

15   counsel has told you.  I'm not sure.

16             MR. FUCHS:  Your Honor, I'd like to hand the witness a

17   document.  And I'm not going to admit -- I'd like to show it

18   to --

19             MR. WOOTEN:  It's okay.

20   BY MR. FUCHS:

21   Q.   If you would, if you'll start where my email starts and

22   read to yourself backwards starting right here.  And then read

23   PHH's response and read your counsel's response, please, to

24   yourself, not out loud.

25             THE COURT:  I'm a little concerned we're getting

1    attorneys involved in this.  I tried on direct examination to

2    keep whatever you may have said out.  And I don't know why I

3    shouldn't do it now.  I'm concerned that you're getting into

4    lawyers involved in it.

5              MR. FUCHS:  I agree, Your Honor.  That's why I raised

6    the issue about saying the resolution took place.

7              THE COURT:  I thought you brought it up though.

8              MR. FUCHS:  No.  He brought it up in his direct.

9              THE WITNESS:  I might be able to resolve this.  You've

10   got my permission to fix the report --

11             THE COURT:  It's not your time to talk just yet.  It's

12   the judge's time, I think.

13       Where are you going with this?  What are you going to ask

14   him?

15             MR. FUCHS:  All I want to establish is we were

16   instructed not to do anything with the report at this period in

17   time.

18             MR. WOOTEN:  Your Honor, let me try and clarify.  We

19   just told them we would give the instruction as soon as the

20   documents were provided.  And that is a ten-day window.  And we

21   don't have the documents back to look at.

22             THE COURT:  Is that not a sufficient answer?

23             MR. FUCHS:  That's a sufficient answer, Your Honor.

24             THE COURT:  Can we go on to something else?

25             MR. FUCHS:  I do.

1          THE COURT:  Thank you, sir.

2     BY MR. FUCHS:

3     Q.   Now, for a moment at the beginning you talked about

4     putting the money in savings that would go to PHH.  You do

5     acknowledge, sir, that you haven't paid PHH one payment since

6     March of 2011?

7     A.   That's correct.

8     Q.   So not anything in 2012?

9     A.   No.

10    Q.   Nothing in 2013?

11    A.   No.

12    Q.   And nothing in 2014 up until the resolution?  And we don't

13    know what that resolution is, correct?

14    A.   That's correct.

15    Q.   And you claim, if I understand it, that you did that

16    because PHH told you not to pay?

17    A.   That's correct.

18    Q.   Now, there's -- on all of the tapes that were admitted,

19    you're not going to hear anywhere on those tapes, are you, sir:

20    Don't pay?

21    A.   No.  When the person told me that, it was before I started

22    recording.

23    Q.   Okay.  But you will hear on the tapes when I -- that you

24    need to make your payment?

25    A.   Yes.  I believe there was one lady in May that told us

Terry Toler - Cross

1   that we could start making our payments and that the stop was

2   off.

3   Q.  It's actually two ladies, isn't it?

4   A.  I only remember one.  If you say that there's two, then

5   I'll take your word for it.

6   Q.  Okay.  But you didn't make the payments, did you?

7   A.  No.

8   Q.  Okay.  And so you have been living in the house since

9   March of 2011 without making one payment to PHH?

10   A.  That's correct.

11   Q.  And you understand, sir, that there is a thing called

12   escrow?

13   A.  Yes.  I'm familiar with escrow.

14   Q.  You haven't been putting the money in escrow, have you,

15   sir?

16   A.  No.  We have just been setting it aside in our own

17   account.

18   Q.  And we don't have a record of what that was set aside at

19   this point in time, do we, sir?

20   A.  I have a record, yes, but --

21   Q.  I don't have a record, do I, sir?

22   A.  I don't think so.

23   Q.  No.

24   A.  Although I do believe that as part of discovery, we made

25   that particular account available to you and PHH's counsel,

1   so -- we signed waivers for all of our bank accounts, and so

2   you certainly would have had access to that if you received

3   that bank information.

4   Q.   Are you certain that we got those waivers?

5   A.   I don't know.

6   Q.   Okay.

7   A.   I know that we signed the waivers for you to get them.

8   Q.   Okay.  Now, your claim in this case is mental anguish, is

9   that correct?

10  A.   Yes.

11  Q.   And your claim for mental anguish is limited to what time

12  frame, sir?

13  A.   February of 2011 through today.

14  Q.   Now, it's true that you've admitted in this lawsuit that

15  you can't pinpoint any damage to Experian from February of 2011

16  to November 2011, correct?

17  A.   I don't think that I've said that, no.

18  Q.   Now, you've been very involved in this lawsuit, haven't

19  you?

20  A.   Yes.

21  Q.   And you've reviewed the pleadings your counsel has filed?

22  A.   Yes.

23  Q.   And so if your counsel has said to this Court that you

24  cannot pinpoint -- and let me read it -- "Experian is correct

25  that the harm suffered by the Tolers from February 2011 to

Terry Toler - Cross

1    November 2011 cannot be pinpointed to Experian," you wouldn't

2    doubt that, would you, sir?

3    A.   No, I wouldn't doubt that particular statement as it

4    relates to damages.  But I think that we are claiming that

5    Experian should have investigated properly the trade line in

6    August of 2010, and had they done so, then it would have --

7    then the problem that occurred in February of 2011 wouldn't

8    have happened.

9    Q.   So your claim in this case is mental anguish, right?

10   A.   Yes.

11   Q.   That's the only thing you're claiming in this case,

12   correct?

13   A.   Yes.

14   Q.   And your claim for mental anguish has to start after

15   November 2011, correct?

16   A.   No.  I think our claim for mental anguish starts in

17   February of 2011.

18   Q.   But you do understand that I just read your counsel has

19   said, "Experian is correct that the harm suffered by the Tolers

20   from February 2011 to November 2011 cannot be pinpointed to

21   Experian," correct?

22   A.   That's what the statement says, yes.

23   Q.   Now, Mr. Wooten went through a lot of credit reports with

24   you.  And when he did that, there was a lot of "theys."  And I

25   want to make it clear, you're not claiming that Experian is in

Terry Toler - Cross

1    some way PHH, is it?

2    A.   No.

3    Q.   PHH is responsible for their own activity, correct?

4    A.   Correct.

5    Q.   And you're not claiming that your disputes to TransUnion

6    is in some way a dispute to Experian, is it?

7    A.   No.

8    Q.   The same thing for Equifax.  Your dispute for Equifax --

9    or disputes with Equifax is not a dispute to Experian, correct?

10   A.   That's correct.

11   Q.   And you do acknowledge that you only contacted Experian

12   two times prior to filing this suit?

13   A.   That's correct.

14   Q.   And you do acknowledge that when you contacted Experian,

15   you didn't attach any documents?

16   A.   That's correct.

17   Q.   You didn't give any phone call -- let me back up.  You

18   didn't make any phone calls?

19   A.   No.

20   Q.   You didn't send a recorded loan modification?

21   A.   No.

22        MR. FUCHS:  Let's start with Plaintiffs' Exhibit 86,

23   which has already been admitted.

24        Will, if you can pull it up.

25        We may have to, Your Honor -- it's already there.

Terry Toler - Cross

1          (Off the record.)

2              THE COURT:  86 was admitted, right?

3              MR. FUCHS:  Can you shift to plaintiffs' for a second?

4              THE COURT:  Is it Plaintiffs' 86?

5              MR. FUCHS:  86.

6              THE COURT:  It's previously admitted.  Do you want to

7    show it to the jury?

8              MR. FUCHS:  Yes.

9              THE COURT:  Okay.  Fine.

10          (Off the record.)

11   BY MR. FUCHS:

12   Q.   So from February 2011 until the end of November 2011, you

13   agree that TransUnion was reporting the PHH trade line?

14   A.   Yes, that's correct.

15   Q.   And from February 2011 to November 2011, Equifax was

16   reporting the PHH trade line, correct?

17   A.   Yes.  All three credit reporting agencies were reporting

18   180 days late.

19   Q.   And Mr. Wooten started with you in December of 2009, and

20   he pulled up your credit disclosure, and he jumped straight to

21   page 3.  I want to take a look at page 1.

22              MR. FUCHS:  If you can pull up the left-hand side of

23   this.

24   BY MR. FUCHS:

25   Q.   It says here, "If you disagree with an item, you may

Judith A. Ammons, RPR, CRR, CCR
United States Court Reporter

1    dispute it."  And then it says, "We will contact the source of
2    the information and ask them to check their records."
3        It is true, sir, that in December of 2009, you knew if you
4    disputed it, that that's one of the steps that Experian would
5    take, correct?
6    A.   If I disputed it in 2009, I'm not sure exactly what steps
7    that you would take, but, yes, you are to conduct an
8    investigation if I dispute it.
9    Q.   And it says here, "We will contact the source of the
10   information and ask them to check their records."  Did I read
11   that correctly?
12   A.   Yes.
13   Q.   And then down below that, it gives a number, "Or call
14   1-800-509-8495.  Dispute services are available 24 hours a day,
15   seven days a week."  Is that correct?
16   A.   Yes.
17   Q.   And you did not ever call Experian prior to this lawsuit,
18   correct?
19   A.   I did not.
20        MR. FUCHS:  And if you'll pull up the right-hand side,
21   because I don't think we have really oriented ourselves to what
22   these documents -- the organization of them and what they show.
23   BY MR. FUCHS:
24   Q.   Over on the right-hand side, it's got five categories:
25   Potentially negative items for further review; accounts in good

1    standing; history of your account balances; requests for your

2    credit history; and your personal information.  You understand

3    that the personally (sic) negative items or items for further

4    review would be the items that are showing up negative on your

5    account?

6    A.   Yes.

7    Q.   It could have an adverse impact on you?

8    A.   Right.

9    Q.   Okay.  Now, I don't think we looked at page 2 before, but

10   let's look at page 2.

11          MR. FUCHS:  If you could pull up the American

12   Express -- first, pull up all the way to the top, please.

13   BY MR. FUCHS:

14   Q.   So you agree, sir, that page 2 is the potentially negative

15   items for further review?

16   A.   Yes.

17   Q.   And that is in December of 2009.  Is that when we're

18   looking at this?

19   A.   Yes, December 14th.

20          MR. FUCHS:  If you'll pull up the two trade lines

21   below that or the two account lines below that.

22   BY MR. FUCHS:

23   Q.   So there's an account line that's reporting as negative

24   there, American Express.  And it was reported in May of 2009,

25   is that right?  Is that what it says?

1    A.    Yes.

2    Q.    And it's -- this is a credit card?

3    A.    Correct.

4    Q.    And it shows a high balance of $26,172?

5    A.    Yes.

6    Q.    And a recent balance of $24,724?

7    A.    Yes.

8    Q.    And this account was in collection, is that correct?

9    A.    That's what it states on the report.

10   Q.    And the next account below is CitiFinancial Retail

11   Services?

12   A.    Yes.

13   Q.    This is an account you and Mrs. Toler used to buy

14   furniture for the home you bought in Eagle Rock?

15   A.    I'm not sure if that's the card or not.

16   Q.    Okay.

17   A.    It may be.

18   Q.    It's another credit card that in December of 2009 showed a

19   high balance of $19,424 -- $25?

20   A.    Correct.

21   Q.    And it was closed at that time, is that correct?

22   A.    Yes.

23   Q.    Okay.  In the PHH account, which is on the next page, it's

24   the third item that's reporting negative, right?

25   A.    The page hasn't come up for me yet.  Yes, it's showing

Terry Toler - Cross

1    it's a potentially negative item.

2    Q.    Okay.  There's nowhere on this trade line at this point in

3    time that shows the accounts in a modification, is there -- the

4    mortgage is in a modification -- excuse me?

5    A.    No, that information is not on here.

6    Q.    And at this time, you dispute that -- or your position is

7    this isn't reporting correctly, right?

8    A.    Correct.

9    Q.    Okay.  And you did not contact Experian in any way in

10   December of 2009, correct?

11   A.    I did not.  I contacted PHH.

12   Q.    So the first time you contacted Experian was in August

13   of 2010?

14   A.    Yes, that's correct.

15   Q.    And that dispute was done online?

16   A.    Right.

17   Q.    And at the time, you didn't just dispute PHH; you disputed

18   eight other items on your credit report?

19   A.    That could be.  I don't have it up.  But if you say so,

20   then I won't disagree with that.

21   Q.    And at that time, the account was in good standing?

22   A.    Which account?

23   Q.    The PHH account.

24   A.    Yes.  It wasn't reporting negative.  It wasn't reporting

25   negative on Experian.  It was reporting derogatory on Equifax.

1          (Off the record.)

2                MR. FUCHS:  Can we pull up Experian Exhibit 32?

3          Your Honor, this is the same as the plaintiffs' exhibit.

4    BY MR. FUCHS:

5    Q.   This looks like the same -- this consumer disclosure we

6    looked at a minute ago from 2009?

7                THE COURT:  And what's the number on this one?

8                MR. FUCHS:  It's Experian Exhibit 32, Your Honor.

9                THE COURT:  Any objection to that?

10               MR. WOOTEN:  No, sir.  I apologize.

11               THE COURT:  It will be admitted.

12         (Defendant's Exhibit 32 received in evidence.)

13               MR. FUCHS:  I have one IT issue, Your Honor.  It's not

14   showing up on my screen.

15         (Off the record.)

16               MR. WOOTEN:  We're having technical difficulty on that

17   screen, Judge.  It might be tinting or something.

18               MR. FUCHS:  It's fine.  You just can't see the

19   document, you can't see the words.  You can see the --

20               THE COURT:  Ladies and gentlemen of the jury, I

21   promise you that this system we're using saves literally days

22   and weeks of trial.  Just trust me on that.

23         Go ahead.

24   BY MR. FUCHS:

25   Q.   So on page -- this looks very similar to the December 2009

1    disclosure we just looked at, is that correct?

2    A.   Yes.

3         MR. FUCHS:   Okay.  Let's go to page 2 of this.  And we

4    see -- if you'll pull up the potentially negative items again,

5    the whole thing -- just make that page bigger.

6    BY MR. FUCHS:

7    Q.   We have the same two accounts, the American Express

8    account, the $24,000 account, and the CitiFinancial Retail

9    Services account, those are still reporting negative on your

10   credit report at the time?

11   A.   Yes.

12   Q.   And if you go to the third page, now we're into the

13   accounts in good standing, is that correct?

14   A.   Yes.

15   Q.   Those are the accounts that are not going to have a

16   negative impact on your credit report?

17   A.   Correct.

18   Q.   And so Mortgage Service Center, which is -- we probably

19   ought to clarify that, that is PHH, isn't it?

20   A.   It is, yes.

21   Q.   Okay.  And so it's in the accounts in good standing in

22   August of 2010, right?

23   A.   It's not up on my screen.  I have Chase and --

24   Q.   There it is.

25   A.   Right.  Okay.  Yes.  There is information on there that's

1     not accurate, but it's not reporting as derogatory.

2     Q.   And that information that you disputed to Experian --

3     because you actually disputed it off of this account, right?

4     A.   Yes.

5     Q.   And at this time you went on the Internet and you checked

6     the box that said this is wrong and you typed in what you

7     thought was wrong about it, correct?

8     A.   Correct.

9     Q.   And you typed in the amount should be a $1,801 monthly

10    payment?

11    A.   Correct.

12    Q.   You didn't say a word about the modification at the time?

13    A.   No.

14    Q.   You didn't say that you had been approved for a

15    modification?

16    A.   No.  I didn't think that was something that I would tell

17    the credit reporting agency.  I would just dispute the

18    information that they are reporting.

19    Q.   And you acknowledge that your relationship's with the

20    mortgage company, right?

21    A.   Yes.

22    Q.   You acknowledge that the contracts that you have that go

23    back and forth is between you and the mortgage company, right?

24    A.   Yes.

25    Q.   And Experian doesn't have that, correct?

1    A.    Doesn't have --

2    Q.    The contract between you and the mortgage company?

3    A.    No.  Although they -- once it's filed of record, you can

4    get that -- you can get it because it's public record.  So,

5    yes, you can get that information.

6    Q.    Do you know if credit reporting agencies, sir, pull

7    mortgages for every mortgage in the United States?

8    A.    I don't know if they do.  But I think if there's a

9    dispute, an investigation, one of the first things I would do

10   is go and look at the records -- the public records to see if

11   the payment is being disputed.  You can see right there in the

12   public records what the payment amount is and that's easily

13   available to you.  So I would think if you were doing a

14   complete investigation, that's one of the first places you

15   would go, an independent investigation.

16   Q.    You've learned over the course of this case that what

17   Experian is required to do under the law is called a

18   reinvestigation?

19   A.    If you say so.  I'm not sure I understand the difference.

20         MR. FUCHS:  Let's look at Experian Exhibit 44.

21   And, Nick, this is the response to this.

22         MR. WOOTEN:  That's fine.

23         THE COURT:  And was this exhibit stipulated also?

24         MR. WOOTEN:  Yes, Your Honor.

25         THE COURT:  It's admitted.

1          (Defendant's Exhibit 44 received in evidence.)

2          MR. FUCHS:  If you can pull up the investigation

3    results section.

4    BY MR. FUCHS:

5    Q.   It says:  This summary shows the revisions made to your

6    credit file as a result of the verification we recently

7    completed.  If you still question an item, then you may want to

8    contact the source of the information.  The Fair Credit

9    Reporting Act states that you may request the description of

10   how we verify the information including the business name and

11   address contacted and the telephone number if necessary -- if

12   reasonably available.  Did you ask us for that information?

13   A.   I did not.

14   Q.   Then it says:  You can add a statement disputing the

15   accuracy or completeness of the information.  Do you see that?

16   A.   I do.

17   Q.   Did you come to Experian after we said that PHH had

18   verified it and say, "I want to add a statement so that I can

19   show my side of the story"?

20   A.   I did not.

21          MR. FUCHS:  Okay.  Now, if you'll pull up the middle

22   here, please.

23   BY MR. FUCHS:

24   Q.   Does this refresh your recollection that you disputed

25   eight items in August of 2010?

1    A.   Yes.  It looks like there's eight items on there.

2    Q.   So there are a number of items that you would like to have

3    changed on your credit report so that your credit report will

4    reflect different things, correct?

5    A.   Correct.

6    Q.   Okay.  And at the time, Experian said that the Mortgage

7    Service Center account remains?

8    A.   Correct.

9    Q.   Did you reach back out to Experian as soon as you got

10   this?

11   A.   I did not.

12   Q.   So you didn't ask for the statement, and you didn't ask

13   for the information of who we verified it with, correct?

14   A.   Correct.

15   Q.   And all of September 2010 goes by without contacting?

16   A.   Correct.

17   Q.   October 2010 goes by without contacting?

18   A.   Correct.

19   Q.   November 2010 goes by without contacting?

20   A.   Yes.

21   Q.   December 2010?

22   A.   Yes.

23   Q.   January?

24   A.   Yes.

25   Q.   February?

Terry Toler - Cross

1   A.   Correct.

2   Q.   March?

3   A.   Correct.

4   Q.   April?

5   A.   Yes.

6   Q.   May?

7   A.   Yes.

8   Q.   June?

9   A.   Yes.

10  Q.   July?

11  A.   Yes.

12  Q.   August?

13  A.   Yes.

14  Q.   So November is when you finally contacted, correct?

15  A.   Correct.

16  Q.   So a year and three months?

17  A.   Yes.

18  Q.   And you say during this time that Mortgage Service Center

19  changed the way the accounting was, but it was never right --

20  or the reporting was, but it was never right?

21  A.   Can you repeat that?

22  Q.   So you say during this time, from late August 2010 until

23  November of 2011 when you contacted Experian -- you say that

24  Mortgage Service Center or PHH changed various aspects of the

25  reporting during that entire time, correct?

Judith A. Ammons, RPR, CRR, CCR
United States Court Reporter

1    A.   Yes.

2    Q.   And it was never correct?

3    A.   Right.  It was not correct.

4    Q.   And you didn't contact Experian?

5    A.   No.

6    Q.   But during that time, you were recording phone calls with

7    PHH?

8    A.   Yes.

9    Q.   You were receiving foreclosure notices?

10   A.   Yes.

11   Q.   You were receiving letters that were telling you that your

12   modification had been denied?

13   A.   During what time frame?

14   Q.   During that time period, during -- from August of 2010

15   until November of 2011?

16   A.   I don't remember a letter saying we were denied in that

17   time frame.  There might have been, but I don't remember one.

18   Q.   Okay.  You -- so when you disputed with Experian again in

19   November of 2011, you did that for Mrs. Toler on the Internet

20   on November 2nd, correct?

21   A.   Correct.

22   Q.   And your dispute on the Internet when you typed it in was

23   that:  We made all our payments to the credit agency through

24   February of 2011?

25   A.   That's correct.

1   Q.   And you also sent a letter for Mrs. Toler, correct?

2   A.   Yes.

3   Q.   The very next day?

4   A.   Yes.

5   Q.   Saying essentially the same thing?

6   A.   Correct.

7   Q.   Okay.  And Experian responded to Mrs. Toler by saying that

8   the item remains?

9   A.   Yes.

10          MR. FUCHS:  Can we pull up Experian Exhibit 10?  It's

11   Mrs. Toler's disclosure.

12          THE COURT:  That was stipulated to and it's

13   admitted --

14          MR. WOOTEN:  Thank you, Your Honor.

15          MR. FUCHS:  Yes, Your Honor.

16          THE COURT:  -- Defendant's Exhibit 10.

17      (Defendant's Exhibit 10 received in evidence.)

18   BY MR. FUCHS:

19   Q.   So this is another consumer disclosure, but the format has

20   changed a little bit, right?

21   A.   Yes.  It's November 2nd, 2011, looks like a different

22   format.

23   Q.   So you don't have any reason to doubt that Experian

24   changed its format of its consumer disclosures during this time

25   period, right?

Terry Toler - Cross

1    A.   No.

2         MR. FUCHS:  If you'll go to page 2 of this and pull up

3    on the right-hand side disputing information in this account.

4    BY MR. FUCHS:

5    Q.   This is very similar language to the language which we saw

6    back when we looked at the December 2009 -- your consumer

7    disclosure, right?

8    A.   It looks to be similar, yes.

9    Q.   And it says again in the third -- in the fourth sentence,

10   it says:  We will process your dispute generally by sending

11   your dispute to the furnisher of the information or to the

12   vendor who collected the information from a public record,

13   correct?

14   A.   Yes, that's what it says.

15   Q.   And then it says:  The fastest way and easiest way --

16   fastest and easiest way to dispute most information is to visit

17   our website?

18   A.   Correct.

19   Q.   And you can dispute -- you can complete the dispute form

20   at the end of the report and mail it in, and then it gives you

21   Experian's address?

22   A.   Right.

23   Q.   And the last thing it says is:  You can call us and

24   dispute, correct?

25   A.   Right.

Terry Toler - Cross

1    Q.    And you actually did on the next day send a letter to

2    Experian.  So you used that address, right?

3    A.    Yes.  I wasn't sure I could trust the Internet, so we sent

4    one by mail as well.

5    Q.    But when you sent the mail, you didn't attach anything to

6    it, right?

7    A.    No, just the dispute.

8    Q.    You didn't send:  Here's the modification.  Believe me

9    over PHH.  Here's my proof?

10   A.    I did not.

11   Q.    And you agree with me that if Experian simply deleted

12   items when a consumer says, "This is not mine," credit reports

13   would start to become pretty clean?

14   A.    Well, yeah, I would agree with that, but I would also say

15   that when there's a dispute, you have a responsibility to

16   determine if the individual is frivolously disputing it, or if

17   the furnisher has got the information wrong.  Yes, I think

18   that's part of your responsibility.

19   Q.    And you've learned during this lawsuit that a furnisher of

20   information like PHH to Experian has a legal obligation to

21   report accurate information, correct?

22   A.    Absolutely.

23   Q.    Okay.  And you've learned that they certify -- when they

24   verify, they certify that the information is accurate under

25   their legal obligation?

1    A.    Yes.

2    Q.    Let's go to the next page.  And this is Mrs. Toler's

3    disclosure, right?

4    A.    Yes, for November 2nd, 2011.

5    Q.    So it has a different set of accounts than yours, correct?

6    A.    Yes.

7    Q.    And we're -- on page 2, we're in your accounts that may be

8    considered negative, right?

9    A.    Correct.

10           MR. FUCHS:  And if you'll pull up the Bank of America

11   account.

12   BY MR. FUCHS:

13   Q.    This is an account that is listed as potentially showing

14   up as negative, right?

15   A.    Yes.

16   Q.    And it has listed as $105 past due?

17   A.    Correct.

18   Q.    And it's got a 35-dollar monthly payment, right?

19   A.    Right.

20   Q.    And it started going derogatory -- the account was closed

21   sometime in the middle of 2011, right?

22   A.    Yes, that's correct.

23   Q.    And if we go to the next account.  Now, sir, do you

24   understand that once you're 90 days late on something, that

25   that's considered a major derogatory account?

Terry Toler - Cross

1    A.   Yes.

2          MR. FUCHS:  Okay.  So let's pull up the next Bank of

3    America account.

4    BY MR. FUCHS:

5    Q.   This is still in the negative section, is that correct,

6    sir?

7    A.   Yes.

8    Q.   And this one had a credit limit of $34,000?

9    A.   Correct.

10   Q.   And a recent balance or high balance of $38,000?

11   A.   Yes.

12   Q.   And it says "Closed" under Status?

13   A.   Right.

14   Q.   And then it says how much written off?  I can't read it.

15   A.   35,633.

16   Q.   And then down in the Payment History, let's see if we can

17   find out when this was closed.

18         MR. FUCHS:  You have it, Mr. Taylor, on the screen

19   already, just Payment History, if you'll pull up that -- well,

20   actually, go back out of it and pull up Payment History by

21   itself, please.

22   BY MR. FUCHS:

23   Q.   This one was closed in March of 2010, is that right?

24   A.   It doesn't say when it was closed, but it shows that it

25   went delinquent, I believe, in 2009.

1    Q.   Right.  And it was 180 days delinquent by February of 2010

2    is what it's showing?

3    A.   Yes.

4    Q.   And then it says "CO" in March of 2010, right?

5    A.   Yes.  I don't know what "CO" means.

6    Q.   And that's $35,000 that Bank of America is saying that it

7    wrote off in early 2010, is that right?

8    A.   Yes.  That's what it says on the report.

9    Q.   Okay.  Let's go to the next one.  So this one is a Chase

10   Bank account, and it is showing the original credit limit was

11   $17,700 and it had a high balance of $25,000, a little over.

12   Did I read that correctly?

13   A.   Yes.

14   Q.   And a recent balance as of October 2011 of $14,000?

15   A.   Correct.

16   Q.   And then it was also closed in 2011, right?

17        And then if you look under Payment History, it looks like

18   that -- if you look under Payment History, it looks like it

19   went late or started going late in July of 2011, but it was

20   actually closed all the way back in December of 2009, is that

21   right?

22        MR. FUCHS:  Mr. Taylor, can you try to pull that down

23   and make it a little more readable?  That's not going to work.

24   Just pull up half of it.

25        THE WITNESS:  I think I can see it.  Yeah, I think

Terry Toler - Cross

1    that's correct.

2    BY MR. FUCHS:

3    Q.   And that was closed -- that account was closed long before

4    what you're talking about with Experian, right?

5    A.   Yeah, that was closed at our request.

6    Q.   Okay.  And let's go to the next one.  This next one is

7    Discover Financial Services, right?

8    A.   Yes.

9    Q.   And this one is joint with you?

10   A.   Correct.

11   Q.   It's got -- it's another credit card, it's got a

12   13,500-dollar limit?

13   A.   Correct.

14   Q.   And a 13,677-dollar balance?

15   A.   Right.

16   Q.   And a recent balance of $9,862?

17   A.   Correct.

18   Q.   And this one is past due -- it's still open, but it's past

19   due $782?

20   A.   At this -- at this time, yes, November 2nd, 2011.

21   Q.   And this started going late in, looks like, August

22   of 2011, right?

23   A.   Yeah.  That's what I was testifying to earlier is that,

24   you know, in June, July, August, during that time frame when we

25   were out of money, then a lot of these accounts went past due

Judith A. Ammons, RPR, CRR, CCR
United States Court Reporter

1    at that point.

2    Q.   And that's during the time frame when it's been stated

3    that you can't pinpoint any damages to Experian, correct?  We

4    talked about that a little earlier?

5    A.   Yes, that was the statement that was in some document.

6         MR. FUCHS:  Okay.  Let's go to the next one.  Pull

7    that one up, please.

8    BY MR. FUCHS:

9    Q.   The GECRB Home Design, is that the -- I think this is the

10   same as that Citi account, the one I asked you about whether or

11   not it was the account used to buy furniture for the home?

12   A.   Yes, this is the one I remember.  That's probably why I

13   was confused.

14   Q.   And it was a 15,000-dollar credit card limit at the time?

15   A.   Yes.

16   Q.   Went up to 19,509?

17   A.   That's what it says on the report, yes.

18   Q.   And it's got a recent balance of 16,327?

19   A.   That's what is reported, yes.

20   Q.   And then it has the account charged off?

21   A.   That's what it says, yes.

22   Q.   And written off.  And I can't read the amount.  How much

23   is that?

24   A.   It says 16,827 written off, 2,521 past due, as of

25   September 2011.

1  Q.   And this account went delinquent back in 2009, is that

2  correct?

3  A.   It might have gone delinquent in 2009, but then we started

4  getting it caught back up again in 2010.

5  Q.   And then it went delinquent again, got closed in February

6  of 2011, right?

7  A.   Correct.

8  Q.   And just so we -- I understand, "written off" means the

9  creditor is saying:  We're not going to go collect that money.

10 We've lost it.  Right?  That's what it's saying?

11 A.   That's what it's saying, and that's actually inaccurate

12 because we worked out a payment arrangement with them and ended

13 up paying it off.  So even though that's what it says, that's

14 not exactly what happened.

15 Q.   Okay.  Have you had -- have you asked GECRB to contact

16 Experian and change that?

17 A.   I don't know if it's -- I don't remember it being on the

18 report as of right now.  It may be.  But I don't remember if we

19 have disputed that with Experian.  We may very well have.

20 Q.   Okay.  Let's go --

21 A.   I didn't dispute it on November 2nd, 2011, unless it was

22 on that list.

23 Q.   I think in November of 2011 you only disputed the PHH

24 account.

25 A.   Okay.

1          MR. FUCHS:  Okay.  Let's go to the next one.  Go

2     ahead.

3     BY MR. FUCHS:

4     Q.   This one is the Mortgage Service Center.  This is PHH?

5     A.   Yes.

6     Q.   And this is the one that you talked about with Mr. Wooten?

7     A.   Correct.

8     Q.   You didn't talk about these other delinquencies with

9     Mr. Wooten at all, did you?

10    A.   No.

11         MR. FUCHS:  Let's go to the next one.

12         MR. WOOTEN:  Your Honor, if I could offer a

13    stipulation.  We've admitted that there are other derogatory

14    accounts, if that will help us move along.

15         THE COURT:  I understand.  How many more are on this

16    list?

17         MR. FUCHS:  Your Honor, there's 13 derogatory

18    accounts.  Five of them are write-offs, over $100,000 written

19    off.

20         THE COURT:  You're arguing your case now.  My question

21    was:  How many more are you going to ask him about this

22    afternoon?

23         MR. FUCHS:  I was going to finish this, and this is

24    our trip through the derogatory items.

25         THE COURT:  It wasn't a trick question.  How many --

Judith A. Ammons, RPR, CRR, CCR
United States Court Reporter

1          MR. FUCHS:  I think it's probably about four or five,

2    and it's done.

3          MR. WOOTEN:  Your Honor, we'll stipulate that they're

4    all derogatory in the report if it will help us finish tonight.

5          THE COURT:  I'm going to let him try his lawsuit.

6       If you want to ask about those four or five, go ahead.

7    BY MR. FUCHS:

8    Q.   Okay.  We will move fast -- faster through this to make

9    sure, but your claim is mental anguish, right?

10   A.   Yes.

11   Q.   And you would acknowledge that there's many things that

12   affect the ability to get credit, right?

13   A.   Yes.

14   Q.   And you acknowledge that having 13 derogatory items on

15   Mrs. Toler's credit report would have an impact on her getting

16   credit?

17   A.   It would have an impact, but in August of 2010 and

18   December of 2010, we were still able to get credit even with

19   derogatories.  So we weren't being turned down for credit at

20   that time.

21   Q.   You testified on direct that you didn't ask for any credit

22   cards during that time, is that right?

23   A.   That's right.

24   Q.   You were actually going to factoring lenders at that time,

25   correct?

1    A.    Correct.

2    Q.    And that means that they actually get your credit card

3    receipts for your APC sports memorabilia, correct?

4    A.    Some of them do.  Some of them do a daily ACH.

5    Q.    And you can't testify to this jury because you don't know

6    what they make their decision on about whether they give you

7    credit or not, correct?

8    A.    I think -- yeah, I think so.  They pull my personal credit

9    report.  That's one of the factors.  They also -- we provide

10   them with four to six months of bank statements, so they look

11   at our sales history and our deposit history.  And so, yes,

12   they -- I do kind of have a good idea what they look for when

13   they are making a loan.

14   Q.    And so you've said that, but in the middle of 2011 when

15   everything was reporting horribly, you got a credit limit with

16   a factoring lender, did you not, sir?

17   A.    I did in August -- July of 2011.

18   Q.    So the same kind of loans that you said that you were

19   getting in 2010 is the loan you got right in the middle of the

20   period that you say was the worst, right?

21   A.    That's correct, and that was after about 15 denials from

22   February of 2011 to July, we just happened to find one in July

23   of 2011.  After that family meeting we had, we found one that

24   was willing to give us a loan.  And that really was what

25   saved -- saved us and our business.  But once we were reported

Terry Toler - Cross

1    180 days late starting in February, we couldn't get any of

2    those loans.

3         And what -- the way that I understood it is that if you

4    have an American Express that's late, then that doesn't mean

5    that you're not going to get the loan.  But if you're showing

6    180 days late on your mortgage, the underwriters assume this

7    guy is about to go under, and so they are not going to give us

8    a loan.  There's a big difference between the mortgage and the

9    American Express.

10   Q.   Mr. Toler, you're not an expert on credit reporting, are

11   you, sir?

12   A.   Not at all.

13   Q.   And you don't know for sure what they make their decision

14   on?  You believe that based on what you've gone through,

15   correct, sir?

16   A.   Well, I have applied for a lot of credit over the years,

17   and so I certainly have an understanding of what it takes to

18   get credit.  And, you know, a lot of it is common sense and a

19   lot of it is experience.  As you said, I got over a million

20   dollars' worth of loans to start the subdivision.  Well, I have

21   a pretty good idea what I have to do with a bank in order to be

22   able to get a million dollar loan.  And so, yes, sir, I am, you

23   know, fairly familiar with what the bank is going to require

24   from me in the way of credit and in the way of income in order

25   to get a loan.

Terry Toler - Cross

1  Q.   We will get into the million dollars' worth of loans for

2  MDC tomorrow.  But that was loans to the actual company, right,

3  not loans to you personally?

4  A.   Well, they are loans to the company --

5  Q.   Answer my question, sir, if you will.  Were they loans to

6  the company?

7  A.   They are loans to the company that I personally

8  guaranteed, yes.

9  Q.   And another person personally guaranteed them as well,

10  right?

11  A.   Yes.

12  Q.   You will agree with me that there's 13 derogatory items on

13  this consumer disclosure?

14  A.   I haven't looked at them and counted, but we stipulated to

15  that, so if you say there's 13, then I'll agree with that.

16  Q.   And you will agree with me, sir, that five of them are

17  charge-offs or write-offs where the creditor is saying they are

18  not going to be able to get the money?

19         THE COURT:  And I think we covered that.  I heard it.

20         MR. FUCHS:  Okay.

21         THE WITNESS:  Yes, sir.  But we did go back with all

22  of them and work out a payment arrangement, even though it was

23  charged off.  And once we got back on our feet, we went back

24  and resolved the issues with all of those companies.  And, in

25  fact, American Express and Citicorp now gave us a credit card

Terry Toler - Cross

1  when they pulled Equifax' credit report.  So even though we had

2  a derogatory with Amex and Citicorp, we now have an American

3  Express and a Citicorp card, even though it was derogatory

4  during that time.  We worked out those issues.

5          MR. FUCHS:  Your Honor, we can stop and come back

6  tomorrow.

7          THE COURT:  You may stand down.

8      Ladies and gentlemen of the jury, it's a little past when

9  I said, but we're going to finish before 5:00.  We're at a very

10  crucial point in this case.  We're in the middle of

11  cross-examination of one of the plaintiffs.  It's absolutely

12  essential that you not discuss this with anyone, do any

13  research on your own, or get on your computer.  Don't make any

14  phone calls.  And don't discuss it with your spouse or

15  significant other or either of them.  Pardon the pun there.

16  But I do need you -- it's absolutely essential that whatever we

17  learn, we all learn when the eight of us or you're here and

18  we're here in this one court.  So don't discuss it with anyone

19  or allow anyone to discuss it with you.

20      Your significant other tonight is going to say, "Well,

21  you've been gone all day.  You tell me you've been in federal

22  court, so tell me what that case is about."  And then you tell

23  him or her, "The judge said I can't tell you anything.  But

24  probably on Thursday night, maybe even Friday, if you'll take

25  me out to a nice restaurant or if you'll cook an elegant

Judith A. Ammons, RPR, CRR, CCR
United States Court Reporter

1   dinner, I'll tell you more about this case than you ever wanted

2   to know."  That's a little facetious.  But I'm telling you,

3   it's absolutely essential that you not discuss this case.

4        We're going to remain in session and seated until you're

5   out of the room.  Have a nice break, and I'll see you in the

6   morning.  We're going to start at 9:00.  I think we'll have

7   coffee beginning probably at 8:00 or 8:15 or 8:30.  We may have

8   some different pastries in the morning.  Have a nice evening.

9   And leave your notes turned upside down in the jury room.  See

10  you in the morning at 9 o'clock.

11       Remain seated, please, until the jury is out of the room.

12       (Jury exits the courtroom.)

13            THE COURT:  Let the record reflect it's now 4:50 and

14  we're out of the presence of the jury.  Anything anybody want

15  to put on the record out of the presence of the jury?

16            MR. WOOTEN:  Your Honor, the plaintiff hasn't

17  anything.

18            MS. SPAVINS:  Your Honor, the defendants have one

19  minor matter.

20       Tanya Spavins for Experian, Your Honor.

21       In the motions in limine, you are allowing some of the

22  neighbors to testify:  Ms. Hood, Mr. Little, Mr. Dipersia.

23  There is a settlement agreement.  In that agreement, it's very

24  clear that they either have to be given written permission by

25  the plaintiffs, the Tolers, or there has to be a Court order.

Judith A. Ammons, RPR, CRR, CCR
United States Court Reporter

1    And while your order denied the motion in limine to keep them

2    out, it's not affirmatively an order for them to appear and

3    testify.

4         THE COURT:  I've not seen anything that says who can

5    testify and who cannot testify.  And I know nothing about the

6    settlement as far as that's concerned.  So I'm not sure -- do

7    you know about the settlement?

8         MS. SPAVINS:  It was briefed, Your Honor.

9         THE COURT:  What?

10        MS. SPAVINS:  It was covered in the briefs, Your

11   Honor.

12        MR. WOOTEN:  Your Honor, there was a non-disparagement

13   clause and a confidentiality agreement involving all of the

14   parties wherein they agreed that they had resolved all of their

15   differences and they would go their separate ways and sing

16   *Kumbaya*, and that would be the end of the story.  So we're a

17   little bit surprised that Ms. Hood is flying, of her own free

18   will, from California to come talk about these issues with

19   respect to the Tolers.

20        But as they are well aware, there is this agreement in

21   place that she appears willing to violate if you're willing to

22   let her.  It was part of our objection.  We just think it's

23   kind of really irrelevant to the whole case.  You've heard more

24   about it today in the testimony and maybe you have a better

25   idea --

Judith A. Ammons, RPR, CRR, CCR
United States Court Reporter

1          THE COURT:  Are you saying I should not permit you to

2     call the witnesses that you want to call?

3          MS. SPAVINS:  I'm saying that you should permit me,

4     but these witnesses want an order from the Court to protect

5     themselves.  So that right, wrong, or indifferent, these

6     witnesses' concern -- their concern is that they may be sued

7     again in the future by the Tolers, and so they have asked that

8     there be an actual order in place --

9          THE COURT:  Well, I may not -- it may be a verbal

10    order.  Is she already here, the lady from California?

11         MS. SPAVINS:  She is.  She actually lives in Eagle

12    Rock.  Her home is in Eagle Rock.  She's here.  The husband is

13    in California at this time.

14         THE COURT:  Is the husband coming?

15         MS. SPAVINS:  He is not, Your Honor.

16         THE COURT:  I'll tell you what.  I will visit with her

17    out of the presence of the jury concerning the fact that she's

18    got to testify.

19       Anything further?

20         MR. WOOTEN:  No, Your Honor.

21         THE COURT:  Are there two others in addition to

22    Ms. Hood?

23         MS. SPAVINS:  There are, Your Honor.  It's Jamie Hood,

24    Mr. Don Little, and Mr. Dominic Dipersia.  All three of them

25    are parties to that settlement agreement we've been discussing.

1          THE COURT:  That must be some settlement agreement.

2          MR. WOOTEN:  It was the settlement of the entire

3    homeowners' association squabble out at Eagle Rock that was

4    before all of this, Your Honor.

5          THE COURT:  Settle any wars or anything?

6          MR. WOOTEN:  Apparently there was a huge settlement

7    over a five-acre park that became a two-acre --

8          THE COURT:  I may ought to just -- and I can do it in

9    chambers or in confidence in camera, I can see the settlement

10   agreement before they testify.  They are not going to testify

11   anyway tomorrow, are they?

12         MS. SPAVINS:  Well, Ms. Hood is the one that we asked

13   to call out of order because she's leaving on Thursday to

14   travel to California to join her husband for holiday.  So we've

15   asked to call her out of order.  But I don't see calling her in

16   the middle of Mr. Toler's testimony.  I mean, any time tomorrow

17   is sufficient.

18         MR. WOOTEN:  Your Honor, honestly, I might rather her

19   go before Mr. Toler's cross-examination resumes because then

20   maybe I can question her about her testimony and it may be a

21   little easier to explain some of this stuff.

22         I was under the impression, Your Honor, we were told that

23   she was flying here from California, she was in town for a

24   couple of days and going back, and we were accommodating her

25   schedule.  Now tonight we hear that she actually lives here,

1    but she's going to California.

2           THE COURT:  This is a very accommodating Court.  We'll

3    accommodate her.  I will need to see in camera the agreement.

4    I don't want to get her in trouble for violating the agreement.

5    By the same token, I'm not a party to it, but I do have a

6    lawsuit that's going on.

7           MS. SPAVINS:  Would you like to see it now, or would

8    you like for us to take it up in the morning, Your Honor?

9           THE COURT:  Why don't you leave it now and I'll look

10   at it in the morning.  And, again, the same rule as --

11   understanding as last night, we'll start court at 9:00, but

12   we'll be here at 8 o'clock.  If there's something someone wants

13   to place on the record from 8:00 to 9:00, if you can find my

14   court reporter and the other attorneys, whatever, we'll be

15   happy to hear you.

16       Anything further?

17          MS. SPAVINS:  No, Your Honor.

18          MR. WOOTEN:  We were just conferring about that

19   settlement agreement to leave with Your Honor.

20          THE COURT:  I'm in chambers.  It's through the door

21   that says "Pull" as opposed to "Push."

22       Have a nice evening.  I'll see you in the morning.

23       (Proceedings adjourning at 4:56 p.m.)

24

25

                    Judith A. Ammons, RPR, CRR, CCR
                    United States Court Reporter

1                          C E R T I F I C A T E

2          I, Judith A. Ammons, Official Court Reporter, do hereby

3     certify that the foregoing is a true and correct transcript of

4     proceedings in the above-entitled case.

5

6

7

8     /s/  Judith A. Ammons, RPR, CRR, CCR   Date: December 9, 2014
           United States Court Reporter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25


                    Judith A. Ammons, RPR, CRR, CCR
                     United States Court Reporter